Mary Ann LAMANQUE, et al, Plaintiffs,

v.

MASSACHUSETTS DEPARTMENT OF EMPLOYMENT AND TRAINING, et al, Defendants.

No. Civ.A. 94–12060–RCL.

United States District Court, D. Massachusetts.

Feb. 24, 1998.

Janet Cohan, Whately, MA, for Mary Ann Lamanque.

Benjamin Robbins, Attorney General's Office, Boston, MA, Margaret Monsell, Office of Attorney General, Boston, MA, for Mass. Dept. of Employment & Training, Nils Nordberg, Richard Dill, William R. Lupica, John B. Edwards, Alan Pollard, Gerald Covino, Ed Galante, Carlton Johnson, Joseph Gallante, Jon Tirrell, Janytt Scott.

Benjamin Robbins, Attorney General's Office, Boston, MA, Margaret Monsell, Office of Attorney General, Boston, MA, Edward J. Sylvia, Jr., New Bedford, MA, for Douglas A. Abdelnour, Douglas Island Development Corp.

*MEMORANDUM AND ORDER ON DE-*
*FENDANTS' MOTION FOR PARTIAL*
*JUDGMENT ON THE PLEADINGS*

LINDSAY, District Judge.

### I. *Introduction*

In this action, the plaintiff, Mary Ann LaManque (the "plaintiff"), alleges that the defendants—her former employer, the Massachusetts Department of Employment and Training ("DET"), several named employees of DET, several named employees of the Massachusetts Department of Transitional

Assistance ("DTA"),[1] and other named individuals—engaged in a concerted effort to discriminate and retaliate against her because of her advocacy of the rights of persons with disabilities. The plaintiff claims that the advocacy, to which the defendants took exception, included her public opposition to DET's plans to move from a handicapped-accessible location on Martha's Vineyard, Massachusetts to an inaccessible location on that island. The defendants are DET; Nils Nordberg ("Nordberg"), commissioner of DET at all times relevant to the complaint; Richard Dill ("Dill"), assistant commissioner of DET at all times relevant to the complaint; William R. Lupica ("Lupica"), southeast regional director of DET at all times relevant to the complaint; John B. Edwards ("Edwards"), southwest director of DET at all times relevant to the complaint; Allan Pollard ("Pollard"), branch administrator of DET at all times relevant to the complaint; Gerald Covino ("Covino"), manager of real property for DET at all times relevant to the complaint; Ed Galante ("Galante"), an employee of DET at all times relevant to the complaint; Carlton Johnson ("Johnson"), project manager for DET's move on Martha's Vineyard; Douglas A. Abdelnour ("Abdelnour"), trustee and beneficial owner of Douglas Realty Trust; Douglas Island Development Corporation ("Douglas Island"); Joseph Gallante ("Gallante"), commissioner of DTA at all times relevant to the complaint; Jon Tirrell ("Tirrell"), director of the DTA office in Wareham, Massachusetts at all times relevant to the complaint; Janytt Scott ("Scott"), facilities manager of DTA at all times relevant to the complaint; Marilyn Welch ("Welch"), an employee of DTA at all times relevant to the complaint; and Douglas Realty Trust ("Douglas Realty"), owner of record of the real estate at Two Douglas Lane, Oak Bluffs, Massachusetts and landlord of DTA at all times relevant to the complaint.

The plaintiff makes a number of claims against these defendants. In Count I she

alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., by DET, Nordberg in his official and individual capacities; Dill; Lupica; Edwards; Pollard; Covino; Galante; Johnson; Abdelnour; Douglas Island; Tirrell; Scott; Welch; Douglas Realty; and Gallante, in his individual and official capacities. In Count II, brought pursuant to 42 U.S.C. § 1983, the plaintiff seeks equitable relief against Norberg and Gallante, in their official capacities, and damages against all other defendants for claimed violations of her rights under the First and Fourteenth amendments to the Constitution of the United States. In Count III she seeks equitable relief against Nordberg and Gallante in their official capacities, and damages against all other defendants for claimed violations of 42 U.S.C. § 1985(3). In Count IV she alleges that all the individual defendants and Douglas Island and Douglas Realty interfered with her civil rights in violation of Mass.Gen.L. ch. 12, §§ 11H–11I. In Count V she seeks damages against all the individual defendants and Douglas Island and Douglas Realty for the intentional infliction on her of emotional distress. In Count VI she alleges that all of the individual defendants and Douglas Island and Douglas Realty engaged in a civil conspiracy to cause her severe emotional distress. In Count VIII she alleges the tortious interference with contractual relations by all the individual defendants and Douglas Island and Douglas Realty. In Count VII she alleges a breach of her employment contract by Nordberg, Dill, Lupica, Edwards, Pollard, Covino, Galante and Johnson. Finally, in Count IX, John H. LaManque ("John LaManque"), the plaintiff's husband, makes claims against all the individual defendants and Douglas Island and Douglas Realty for loss of consortium.

DET and those individual employees of DET and DTA named as defendants (collectively the "state defendants") have filed a renewed motion for partial judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c),[2]

---

1. At the time of the events from which this action arises, DTA was called the Department of Public Welfare.

2. The court has treated the renewed motion for partial judgment on the pleadings as having su-

perseded the state defendants' original motion for partial judgment on the pleadings and the arguments made in support of that original motion.

with respect to counts I, III, IV, V, and VI of the second amended complaint (the "complaint"). In that same renewed motion, the employees of DTA, named as defendants in the complaint (the "DTA defendants"), claim that the complaint fails to allege facts showing involvement by them in *any* of the unlawful conduct asserted in the complaint; and for that reason, the DTA defendants seek judgment on the pleadings as to all counts in which they are named.

## II. *Factual Allegations*

The complaint alleges the following.[3]

The plaintiff worked as a full-time contract employee for DET in various positions in the Edgartown office on Martha's Vineyard from July 1988 through June 1992. From November 1998 through June 1992, she received positive job performance reviews for her work as an interviewer. In October 1989, DET presented her with a statewide Customer Service Award for "outstanding achievement in providing quality service."

On October 12, 1991, a DTA employee told the plaintiff that DET would be relocating from its office in Edgartown to an office building occupied by DTA at Two Douglas Lane in Oak Bluffs on Martha's Vineyard. The DTA employee gave as a reason for the move the need to reduce the costs of maintaining a DTA presence on the island. Scott, the facilities manager for DTA, in a letter to the regional planner, confirmed the recommendation of the Oak Bluffs site for relocation.

The Oak Bluffs building was not accessible to handicapped persons and lacked available public transportation, in violation of the ADA and state regulations. The plaintiff alleges no disability of her own, such that she personally would be denied reasonable access to the new DET offices. Nevertheless, she protested the move and called her supervisor, Pollard, in Hyannis, Massachusetts to advise him about the handicapped-accessibility problem and about the new location's failure to meet state requirements. Pollard responded by telling the plaintiff to "call out the troops." He suggested to her that she

ask DET claimants to call their local state legislative representatives if such DET claimants opposed the move.

With Pollard's approval, the plaintiff met with local state representatives on Martha's Vineyard to discuss her concerns over the proposed move. Also with Pollard's permission, the plaintiff wrote a nine-point petition offering reasons for keeping DET's office in Edgartown. She placed the petition on a table in the waiting area at the Edgartown office, and by late October 1991, the petition had garnered more than 1,200 signatures. The delivery of the petition to the Governor of the Commonwealth resulted in a temporary suspension of the move. Several days later, however, Pollard told the plaintiff to "call off the troops."

Nothing further occurred until March 1992, when the plaintiff was sent to Hyannis for a supervisory training session. She later learned, however, that while she was in Hyannis, two DET internal controls investigators from Boston traveled to Martha's Vineyard to ask of the plaintiff's co-workers questions about her.

On two other occasions in March and April 1992, the plaintiff was called away from Martha's Vineyard for questioning about her involvement, during October 1990 and October 1991, with the Dukes Conservation District. She also received a formal written warning dated April 6, 1992, from DET's southeast regional director, Lupica, reprimanding her for using DET's telephone number on documents advertising events for the Duke Conservation District, even though she had received Pollard's approval to do so.

On May 28, 1992, Covino, DET's real property manager, notified the landlord of the Edgartown DET office that DET was terminating its lease for its Edgartown office space, effective June 23, 1992. The plaintiff arranged with Pollard and Johnson, project manager for the move, that the move from the Edgartown office to Oak Bluffs would take place at twelve noon on June 23, 1992, and that the office would remain open to serve clients until that time. On the day of

3. For reasons that will become clear later in this memorandum and order, the allegations of the 175-paragraph complaint are set out here in some detail.

the move, Johnson and his moving crew arrived at DET's office at approximately 11:00 a.m. and disrupted service to three clients. Johnson ordered his crew to disconnect telephone and computer wires, began to load the moving truck, and repeatedly shouted at her, "Why aren't the boxes packed?"

When the plaintiff arrived at the Oak Bluffs office she found that conditions there were unprofessional and unhealthy. The windows were left open at night, allowing three cats, belonging to the landlord's sister, to roam freely in the office; rugs were torn and dirty; and ants and cat dander were in the rugs and furnishings. The combination of these conditions caused the plaintiff to experience allergic reactions, including itchy, watery eyes and shortness of breath. Furthermore, the phones in the office went uninstalled for eight days, and there were no computer hook-ups.

On June 29, 1992, Abdelnour, acting for Douglas Realty, approached the plaintiff in the parking lot outside of the Oak Bluffs office in a threatening manner and said, "I want you out of there tomorrow ... I want you folks, your agency, out of there tomorrow." The plaintiff felt threatened by Abdelnour's conduct and was fearful of his intentions.

The next day, Pollard had a private meeting with DTA employee Welch at the Oak Bluffs office. Pollard and a DTA employee union steward named Bob Abruzzese ("Abruzzese") then had a meeting with Abdelnour, at which time Abdelnour issued an ultimatum: either DET fire the plaintiff or Abdelnour would evict the agency from the building. Pollard denied the plaintiff's request to allow her to attend this meeting. After the meeting, Abruzzese informed the plaintiff of Abdelnour's ultimatum. He also informed her that some DTA employees had complained about her.

Pollard told the plaintiff that the DET office would never move from Oak Bluffs. When the plaintiff asked, "Why?," Pollard said, "Don't question it."

On July 2, 1992, Tirrell, director of the DTA office in Wareham, Massachusetts, sent Pollard a letter complaining that the plaintiff "often arrives late for work, entertains acquaintances in the office, and has alienated the landlord."

On July 3, 1992, the Cape Organization for the Rights of The Disabled ("C.O.R.D.")[4] sent formal letters to Nordberg and Gallante complaining of specific violations of the ADA.

On July 9, 1992, the plaintiff made an emergency appointment with her doctor for investigation and treatment of health problems caused by the conditions at the office in Oak Bluffs. On that same day, the DET office in Hyannis, Massachusetts received a facsimile message from Abdelnour stating, "If DET allows LaManque to remain on my property, I will be forced to evict the entire agency ... I will not, under any circumstances, allow LaManque to inhabit my building past July 9, 1992." Also on that same day, Edwards, southeast area director of DET, notified the plaintiff by letter that she was suspended for two days without pay because her "conduct, attitude, and demeanor during and subsequent to the move of the DET office ... are not considered to be consistent with that expected and/or required of a DET employee ...," and that "her statement to the News Media ... was inappropriate, inaccurate and did not serve to enhance public respect for or confidence in this Agency on the Commonwealth." The letter also warned that "any future incidents of this or any similar in nature" would lead to "further disciplinary action, including major suspension or termination." The plaintiff had never initiated any contact with the news media concerning DET or its move.

From July 9, 1992 forward, the plaintiff remained ill and unable to go to work. Her physician provided her with a letter for DET that advised that the plaintiff should refrain from working until the adverse conditions triggering her medical problems were corrected. On July 10, 1992, the, plaintiff tele-

---

**4.** C.O.R.D. is a citizens group that also opposed the relocation of the DET office. In August 1992, C.O.R.D. filed a formal complaint against DET with the Civil Rights Division of the Department of Justice for alleged violations of the ADA arising from the move of DET's Martha's Vineyard office.

phoned Pollard to inform him that she had a doctor's appointment scheduled for July 13, 1992, but Pollard would not speak with her. The plaintiff also tried to reach Pollard each of the next two days, but was unsuccessful. The plaintiff telephoned a co-worker who told her to call the Hyannis DET office and ask for Bob Delhomme ("Delhomme") if she were obliged to call in sick again.

DET placed the plaintiff on unauthorized leave on July 13, 1992. The next day, the plaintiff called Delhomme to inform him that she was too ill to work. He was not available, and she left a message for him to return her call. On July 17, 1992, Lupica, southeast regional director of DET, wrote the plaintiff a letter informing her that she was being reassigned to the DET office in Hyannis. The letter stated that the plaintiff's conflict with Abdelnour "had the potential to cause a major disruption of DET services on Martha's Vineyard." The plaintiff refused the transfer on the grounds that she was on medical leave.

On August 4, 1992, the plaintiff received a letter from Edwards notifying her that she had been placed on "unauthorized leave without pay" because she failed properly to inform her supervisors of her absence. The letter warned: "If your unauthorized absence continues, the department will consider that you have permanently and voluntarily separated yourself from our employ." The letter also referred to a prior request of DET that the plaintiff provide more information about her medical condition. The plaintiff had never received such a request.

On August 21, 1992, the plaintiff received a notice from Nordberg that she was terminated for abandonment of her job.

### III. Standards for Motion for Judgment on the Pleadings

A motion for judgment on the pleadings, made pursuant to Fed.R.Civ.P. 12(c), tests the legal sufficiency of the complaint, not the plaintiff's likelihood of ultimate success. *Furtick v. Medford Housing Authority,* 963 F.Supp. 64, 67 (D.Mass.1997). In ruling on a motion for judgment on the pleadings, the court must accept all of the material facts as alleged in the complaint as true and view them in the light most favorable to the plaintiff. *See Santiago de Castro v. Morales Medina,* 943 F.2d 129, 130 (1st Cir.1991) *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988); *see also Gaskell v. Harvard Coop. Soc'y,* 3 F.3d 495, 497 (1st Cir.1993); *International Paper Co. v. Jay,* 928 F.2d 480, 482 (1st Cir.1991); *Furtick,* 963 F.Supp. at 67 n. 9. In addition, the court may not grant a dismissal on the pleadings "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of h[er] claim which would entitle h[er] to relief." *Santiago de Castro,* 943 F.2d at 130; *Rivera–Gomez,* 843 F.2d at 635 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Applying these standards, and for the reasons set forth below, the motion of the state defendants for judgment on the pleadings is GRANTED in part and DENIED in part.

### IV. Discussion

#### A. The ADA claim

In count I, the plaintiff alleges that DET and those individual employees of DET and DTA named as defendants in this action (Norberg, Dill, Lupica, Edwards, Pollard, Covino, Galante, and Johnson, of DET; and Gallante, Tirrell, Scott and Welch of DTA)[5] have violated the ADA by discriminating and retaliating against her for her open opposition to the DET move. The claims in this count are brought as violations of Title I and Title V of the ADA, 42 U.S.C. § 12112(a) and 42 U.S.C. §§ 12203(a) and (b) respectively. Section 12112(a), provides:

(a) General Rule

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

Sections 12203(a) and (b), provide:

(a) Retaliation

---

5. These individual defendants are hereinafter referred to as the "individual state defendants"

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

The plaintiff claims that the discrimination and retaliation of which she complains under the ADA took the form of coercion, intimidation, threats and interference, and her eventual dismissal from employment with DET.

The parties have argued their respective views on whether the individual state defendants are "employees" such that they are "covered entities" within the meaning of Title I of the ADA. The plaintiff argues, of course, that the individual state defendants are "her employers;" the individual state defendants predictably contend that they are not "employers" of the plaintiff.

■ Why the parties have concentrated in their briefs on the question of whether the individual state defendant are "employers" within the meaning of Title I is not immediately obvious to the court, in light of a more basic problem with the plaintiff's Title I claim. The fundamental issue is whether the plaintiff has standing to bring a claim under Title I at all.

By its terms, Title I prohibits discrimination against "a qualified individual with a disability." 42 U.S.C. § 12112(a) "The 'term qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or

desires." 42 U.S.C. § 12111(8). The plaintiff has not alleged that she is a "qualified individual with a disability" or that she suffered adverse employment action because of any disability. The failure of the plaintiff to make such an allegation is fatal to her Title I claim, irrespective of whether the individual state defendants can be called her "employers" for purposes of Title I. The plaintiff's claim is therefore dismissed as to all state defendants.

■ If the plaintiff has a claim under the ADA, then that claim would appear to arise under Title V of the ADA. The parties preoccupation with the Title I definition of "employer" has diverted them from a meaningful discussion of whether the plaintiff has stated a claim under Title V. By its terms, however, Title V appears to permit a claim for retaliation or interference by the plaintiff against the individual state defendants. The anti-retaliation provision of Title V imposes liability on "any person" who, against "any individual," engages in certain retaliatory conduct.[6] 42 U.S.C. 12203(a). The interference provision of Title V proscribes interference with, coercion and intimidation of, and threats to any individual exercising, or aiding another in exercising, rights under the ADA; and it appears to make it unlawful for *anyone* to engage in the proscribed practices, beginning as it does with the words of general application: "It shall be unlawful ..." 42 U.S.C. 12203(b). The Title V claims are therefore not expunged from this action, except as otherwise explained in subpart IV F of this memorandum and order.

## B. *The Section 1985(3) claim*

In count III, the plaintiff has alleged that all of the defendants, including the state defendants, conspired to violate her rights under the First and Fourteenth amendments. She seeks redress for the alleged violation under 42 U.S.C. § 1985(3). Section 1985(3) provides in pertinent part:

(3) If two or more persons in any State or Territory conspire ... for the purposes of depriving, either directly or indirectly, any

---

**6.** The term "person" includes one or more individuals, governments, and governmental agencies. 42 U.S.C. § 12111(7), incorporating the definition of "person" as found in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(a).

person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

■■■ To state a claim under 42 U.S.C. § 1985(3), with respect to conspiracies involving public officials, private actors or both, the plaintiff must allege four things: (1) the existence of a conspiracy; (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) the commission of an overt act in furtherance of the conspiracy; and (4) either that the plaintiff suffered an injury to her person or property, or a deprivation of a constitutionally protected right or privilege. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996); *see Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The *Griffin* Court interpreted the second element—the requirement of an intent to deprive a person of her rights under the Constitution or any federal law—to mean that the conspirators' action must be motivated by *"some racial, or perhaps otherwise class-based, invidiously discriminatory animus."* *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790 (emphasis added); *see Hahn v. Sargent,* 523 F.2d 461, 469 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) (same); *see also United Brotherhood of Carpenters v. Scott,* 463 U.S. 825, 835–36, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (concluding that the legislative purpose of § 1985(3) was to combat the widespread animus against African

Americans and their supporters). The First Circuit has held that if no racial animus is charged, a discriminatory, class-based animus must be alleged. *See Harrison v. Brooks,* 519 F.2d 1358, 1359–60 (1st Cir.1975) ("The requirement that the discrimination be class-based is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs. Rather, the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious.")

The plaintiff asserts that a class-based animus existed in this case. She argues that the defendants' discriminatory conduct was based upon the plaintiff's advocacy of the rights of persons with disabilities. That advocacy, she contends, made her a member of a protected class—the class of whistleblowers. *See Lapin v. Taylor,* 475 F.Supp. 446, 449–450 (D.Haw.1979) (holding that federal whistleblowers are a "class" within the meaning of section 1985(3)). *But see Soltani v. Smith,* 812 F.Supp. 1280, 1295 (D.N.H.1993) (holding that a state employee whistleblower was not a protected because section 1985(3) protects "those classes of individuals in unprotected circumstances similar to those of the victims of Klan violence, and whistleblowers are neither in unprotected circumstances, nor do they possess characteristics comparable to those characterizing classes such as race, national origin, and sex.") (quoting *Scott,* 463 U.S. at 851, 103 S.Ct. 3352) (Blackmun, J., dissenting); *Hicks v. Resolution Trust Corp.,* 767 F.Supp. 167, 171 (N.D.Ill. 1991) (holding that whistleblowers are not a class afforded protection under section 1985(3) because they "do not possess characteristics comparable to those discrete and insular minorities granted protection [on account] of race, national origin or gender."), *aff'd,* 970 F.2d 378 (7th Cir.1992).

■■■ Whether, in the First Circuit, whistleblowers constitute a "class" within the meaning of section 1985(3), depends on whether they meet the First Circuit's minimum requirements for recognition of a "cognizable

class" under that statute. *Aulson*, 83 F.3d at 5. The *Aulson* court set forth at a two-part inquiry into: (1) the substantive characteristic defining the putative class, such as race or gender, and (2) whether there is a specific, identifiable class at all. *Id.* at 4–5. While there is no comprehensive set of rules for determining when individuals constitute a "class" for purposes of section 1985(3), at the very least, the class must be "comprised of a separate, distinctive and identifiable group." *Id.* 83 F.3d at 5; *see also Bricker v. Crane*, 468 F.2d 1228, 1233 (1st Cir.1972) (noting that a class must be "readily recognizable" in order to come within section 1985(3)), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973). The *Aulson* court defined distinctiveness to mean "that a reasonable person can readily determine by means of an objective criterion or set of criteria who is a member of the group or who is not." *Aulson*, 83 F.3d at 5–6.

▮ Viewed in light of these standards, whistleblowers are not a "cognizable class" for purposes of the class-based animus requirement of § 1985(3). The RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (SECOND ED., UNABRIDGED, 1987) defines a whistleblower as "a person who informs on another or makes public disclosure of corruption or wrongdoing." As so defined, the "class" of whistleblowers is virtually without limits. It would include an ever-changing group of individuals, from the child who reports to his or her parent that a sibling has taken cookies from the cookie jar without permission, to the person who exposes billions of dollars of fraud and waste in a government agency. It would include the person who informs on another on a single occasion, as well as the person who informs as an occupation (e.g., the undercover police officer or the investigative reporter who specializes in exposing consumer fraud). Whistleblowers may "blow the whistle" on any number of persons, about any number of things for any number of

reasons. Some whistleblowers make their disclosures by means of anonymous tips, while others prefer open, public disclosures in which the whistleblowers identify themselves as the source of the disclosed information. The "class" of whistleblowers is thus so large and encompassing that it might well include nearly everyone in America. (It is not difficult to imagine that most of us, at some time in our lives, have informed on someone about something.) Therefore, while whistleblowers might be said to meet the first *Aulson* inquiry—that is, they are defined by substantive characteristic, namely whistleblowing—they fail the second inquiry, in that they do not constitute an identifiable class at all. "Whistleblowing" in the words of *Aulson* will not suffice as a description of a class under § 1985(3), because the description "draws no readily identifiable line" by which one can tell who is in the class and who is not. *Aulson*, 83 F.3d at 6.

Accordingly, the plaintiff's § 1985(3) claim, asserted in count III, is DISMISSED as to all state defendants.

## C. *The Massachusetts Civil Rights Act*

▮ In count IV, the plaintiff alleges that all the defendants, including the state defendants, by discharging her or seeking her discharge, through threats, intimidation or coercion, interfered with her exercise of rights under the constitutions and laws of the United States and Massachusetts and thereby violated Mass. Gen. Laws ch. 12, §§ 11H and 11I, the Massachusetts Civil Rights Act ("MCRA"). Specifically, the plaintiff contends that the defendants were part of a joint venture whose purpose was to interfere or attempt to interfere with her right to speak freely and publicly on matters of public concern and properly to disclose violations of the ADA.

To establish a cause of action under Mass. Gen. Laws ch. 12, §§ 11H [7] and 11I,[8] the

---

7. This statute provides, in pertinent part, as follows: "[w]henever any person or persons ... interfere by threats, intimidation or coercion, or attempt to interfere ... with the exercise or enjoyment by any other person or persons of rights secured by the constitution or law of the United States, or of rights secured by the consti-

tution or laws of the commonwealth, the attorney general may bring a civil action ... " Mass. Gen. Laws ch. 12, § 11H (1996).

8. This statute provides, in pertinent part, as follows: "[a]ny person whose exercise or enjoyment of rights secured by the constitution or

plaintiff must prove that her exercise or enjoyment of rights secured by the Constitution or laws of either the United States or Massachusetts was interfered with, or that there was an attempted interference, and that the interference or attempted interference was by threats, intimidation or coercion. *Raffaele v. Ryder Dedicated Logistics, Inc.*, 931 F.Supp. 76, 80 (D.Mass.1996); *Freeman v. Planning Bd.*, 419 Mass. 548, 646 N.E.2d 139, 148 (1995), *cert. denied,* 116 S.Ct. 337, 516 U.S. 931, 133 L.Ed.2d 235 (1995); *Planned Parenthood League, Inc. v. Blake*, 417 Mass. 467, 631 N.E.2d 985, 989–990 (1994), *cert. denied,* 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 122 (1994); *Bally v. Northeastern Univ.*, 403 Mass. 713, 532 N.E.2d 49, 51–52 (1989). The Massachusetts Supreme Judicial Court ("SJC") has held that a "threat" is "an intentional exertion of pressure to make another fearful or apprehensive of injury or harm;" that "intimidation" is the "putting [of someone] in fear for the purpose of compelling or deterring conduct;" and that "coercion" is an "application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Planned Parenthood*, 631 N.E.2d at 990.

An "actual or potential *physical* confrontation accompanied by a threat of harm" is a necessary element of MCRA claims. *See Planned Parenthood,* 631 N.E.2d at 990–91 (concluding that defendants conduct violated MCRA because that conduct involved actual or potential physical confrontations accompanied by threats of harm); [9] *Willitts v. Roman Catholic Archbishop*, 411 Mass. 202, 581 N.E.2d 475, 480 (1991) (noting relief may be granted under MCRA where the threat, intimidation or coercion involves a physical confrontation accompanied by a threat of harm); *Layne v. Superintendent, Massachusetts Correctional Inst.,* 406 Mass. 156, 546 N.E.2d 166, 168 (1989) (finding no liability under MCRA because there was no actual or potential physical confrontation nor a threat of harm).

The state defendants claim that the MCRA claim must fail because the plaintiff has alleged no physical confrontation accompanied by a threat of harm. The state defendants are on firm ground. Although allegations of threats against some of the state defendants can be found in the complaint, there is nothing in the complaint that links a threat by a state defendant to a physical confrontation. That is to say, there is no allegation of an actual or potential physical confrontation accompanied by a threat of harm. For that reason, the plaintiff's MCRA claim fails and the motion is GRANTED as to Count IV.

### D. The Eleventh Amendment

Each of counts IV through VI of the complaint purports to state a claim under state law against all defendants. The defendants assert that the plaintiff has failed to specify in these counts whether she is suing the individual state defendants in their official capacities or in their individual capacities. As noted above, judgment on the pleadings will be granted to the state defendants with respect to count IV for reasons unrelated to the contentions of the individual state defendants discussed in this subpart IV D. The discussion that follows in this subpart of the memorandum and order therefore relates to counts V and VI only.

 The Eleventh Amendment precludes the bringing of a federal claim against

---

laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action ... Mass.Gen. Laws ch. 12." § 11I (1996).

9. In *Planned Parenthood,* the SJC took the occasion to characterize its decision in *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 502 N.E.2d 1375 (1987), *cert. denied,* 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989), as a decision involving an actual or physical con-

frontation accompanied by a threat of harm. A judge of this court had held that *Redgrave* involved only economic coercion resulting in an interference with the plaintiff's right of free speech in that case. *Broderick v. Roache*, 803 F.Supp. 480, 486 (D.Mass.1992) (Mazzone, J.). In *Planned Parenthood,* however, the SJC described *Redgrave* as a case that, in fact, involved a potential threat of physical confrontation and harm, resulting in an interference with the plaintiff's right of free speech. *Planned Parenthood,* 417 Mass. 467, 631 N.E.2d 985, 989 n. 8.

state officials based on an allegation that such officials violated state law in carrying out their official duties. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Although the complaint is not a model of clarity on this point, it appears that counts V and VI name the individual state defendants in their individual capacities, not in their official capacities. Each count begins "As to defendants: All named *individual defendants* ...". (emphasis added). In any event, in her brief in opposition to the present motion, the plaintiff states explicitly that she seeks damages against the individual state defendants in their individual capacities only. Plaintiff's Opposition Brief at 24. There is thus no Eleventh Amendment bar to the claims asserted in counts IV through VI. The individual state defendants' motion to dismiss those counts on Eleventh Amendment grounds is DENIED, except as otherwise explained in subpart IV F of this memorandum and order.

### E. *Intentional Infliction of Emotional Distress*

In count V, the plaintiff alleges that the defendants' conduct constitutes, as to her, the intentional infliction of emotional distress. All the state defendants are named in this count.

To state a cause of action for the intentional infliction of emotional distress under Massachusetts law, the plaintiff must show: (1) that the defendants intended to cause, or should have known that their conduct would cause, emotional distress; (2) the defendants' conduct was extreme and outrageous; (3) the defendants' conduct caused the plaintiff's distress; and (4) the plaintiff suffered severe distress. *Anderson v. Boston School Comm.*, 105 F.3d 762, 766–67 (1st Cir.1997); *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 681 N.E.2d 1189, 1197 (1997); *Sena v. Commonwealth*, 417 Mass. 250, 629 N.E.2d 986, 994 (1994); *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 318 (1976). Extreme and outrageous conduct is conduct that is "beyond all possible bounds of decency and utterly intolerable in a civilized community." *Sena*, 629

N.E.2d at 994 (*quoting Agis*, 355 N.E.2d at 318). Moreover, a defendant's liability

> cannot be predicated on 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,' nor even is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'

*Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72, 82 (1987) (quoting Restatement (Second) of Torts § 46 comment d (1965); *see also Tetrault*, 681 N.E.2d at 1197). *Foley* thus imposes a substantial burden on a plaintiff seeking relief upon a claim for intentional infliction of emotional distress.

Taking all the allegations in the complaint as true and indulging all reasonable inferences in favor of the plaintiff, the court concludes that the plaintiff cannot establish a claim for intentional infliction of emotional distress. That conclusion is reached even in light of the SJC's instruction that "the trier of fact would be entitled to put as harsh a face on the actions of the [defendants] as the basic facts would allow." *Richey v. American Auto. Ass'n*, 380 Mass. 835, 406 N.E.2d 675, 678 (1980). What remains of the plaintiff are claims against the state defendants, after the rulings made in this memorandum and order, are that some of the state defendants violated the rights of the plaintiff under Title V of the ADA (Count I); that some of them violated rights secured to the plaintiff by the First and Fourteenth amendments (Count II); and that some of them engaged in a civil conspiracy against her for an unlawful purpose (Count VI). In none of these counts (which, when read in conjunction with the factual background elaborated in detail in paragraphs 6 through 117 of the complaint and restated in Part II of this memorandum and order) does the plaintiff directly or by inference describe conduct that exceeds all possible bounds of decency such that it is atrocious and utterly intolerable in a civilized community within the meaning of *Foley*. *See Richey*, 406 N.E.2d

at 678 (even if the trier of facts inferred that supervisor's decision to terminate plaintiff was a bad, unjust and unkind decision, the plaintiff could not establish a plausible case of outrage). Count V is therefore dismissed as to the state defendants.

### F. *DTA defendants*

Certain of the defendants—Gallante, Tirrell, Scott and Welch—are employees of DTA.[10] They move to dismiss the complaint in its entirety as to them, arguing that the complaint fails to allege facts that link them to any of the various acts of wrongdoing asserted.

The DTA defendants are named in counts I, II, III, IV, V, VI, VII, and IX of the complaint. Under Fed.R.Civ.P. 8(a) the plaintiff is required to set forth sufficient factual allegations to state a claim showing she is entitled to relief under a viable legal theory. *Fitzgerald v.Codex Corp.*, 882 F.2d 586, 589 (1st Cir.1989); *see also Campana v. Eller*, 755 F.2d 212, 215 (1st Cir.1985) (holding that the plaintiff is required to inform the defendants of the nature and extent of the claims against them). Reading the complaint in the plaintiff's favor, *Santiago de Castro*, 943 F.2d at 130, the court can find no allegations that would support claims of wrongdoing against any DTA defendant. *See generally* Part II of this memorandum and order.

The plaintiff comes close to stating a claim—but still misses the mark—with respect to Tirrell. As to him, she alleges the authorship of a letter to Pollard complaining about her stonewalling and disrupting the DTA office in Oak Bluffs. At first glance, that letter could be thought to connect Tirrell to the plaintiff's Title V(ADA) claim (count I), her claims under the First and Fourteenth amendments (Count II), her civil conspiracy claim (count VI), and her claim of tortious interference with her contract rights (Count VII). A careful reading of the com-

plaint, particularized as to Tirrell, however, reveals that the plaintiff has failed to connect the letter directly or by inference to any wrongdoing alleged in these counts.[11]

### V. *Conclusion*

For the reasons stated above, the renewed motion of the state defendants for partial judgment on the pleadings is GRANTED in part and DENIED in part. The court GRANTS the motion with respect to the ADA Title I claim in count I. The court DENIES the motion with respect to the ADA Title V claim in that count, except as to the DTA defendants. The motion is GRANTED as to counts III, IV and V. The court DENIES the motion as to count VI, except as to the DTA defendants. The motion is GRANTED as to all counts against the DTA defendants. The claims asserted in counts II, VII, VIII and IX against all defendants named in those counts (except the DTA defendants) also remain for further adjudication.

SO ORDERED.

---

10. These persons are hereinafter referred to as the DTA defendants.

11. The plaintiff comes closest to stating a claim against Tirrell when the Tirrell letter is read in connection with the claim for tortious interference with the plaintiff's contract rights (count VII). The difficulty, however, is that the only consequence the plaintiff could attribute to the

letter is the termination of her employment. The complaint alleges, however, that the tortious act that proximately interfered with her contract of employment was one by Abdelnour: "Such action [termination of her employment] would not have transpired *but for Abdelnour's intervention.*" Complaint ¶ 159 (emphasis added).