OPINION
{¶ 1} Defendant-appellant, Frank Simpson ("appellant"), appeals from the judgment of the Franklin County Municipal Court convicting him of one count of intimidation in violation of R.C. 2921.04(A).
 {¶ 2} On July 14, 2006, appellant was charged with knowingly attempting to intimidate the victim of a crime in the filing or prosecution of criminal charges in violation of R.C. 2921.04(A). Appellant entered a plea of not guilty and waived his right to a jury trial. The matter proceeded to a trial before the court on January 23, 2007. The court *Page 2 
heard testimony from the victim, John T. Long, Linda Lanis, David Schnese, Anthony Brusadin, Dublin Police Officer Jeffrey Kiedtke, Dublin Police Detective Gwen Higgins, Anthony Pusateri, Tracy Miller, Kyle Dougherty, Jordan Bowdy, Brian Simpson, and appellant.
 {¶ 3} The charge herein relates to an incident that occurred in March 2006 when the Dublin Coffman High School Boys' Lacrosse Team ("the team"), took a three-day trip to Memphis, Tennessee. At the time of the incident, appellant was serving as a volunteer assistant coach for the team since 1990, and his son, Brian Simpson ("head coach Simpson"), was serving as the head coach. Also, serving as assistant coaches were appellant's son Greg Simpson ("assistant coach Simpson"), and Dustin Pentz.
 {¶ 4} It was alleged that while in Tennessee on the team bus, Mr. Pentz placed his fingers in the rectum of the victim, John T. Long, an 18-year-old team member. It was further alleged that assistant coach Simpson was involved in the incident. Appellant was not present on the bus during the alleged occurrence. Approximately three weeks after returning from Tennessee, on April 17, 2006, Dublin Coffman Athletic Director Tony Pusateri was informed by the father of the team captain about what allegedly happened on the team bus. Upon receiving this information, Mr. Pusateri immediately notified the school resource officer, Dublin Police Officer Jeff Liedtke, as well as the assistant principal. At approximately 3:30 p.m. that afternoon, Mr. Pusateri called head coach Simpson and suggested that he call assistant coach Simpson and Mr. Pentz to tell them they were not to be at the game that evening. Officer Liedtke testified that upon learning of the alleged assault from Mr. Pusateri, he informed his sergeant of the allegations. *Page 3 
 {¶ 5} After receiving the phone call from Mr. Pusateri, head coach Simpson called both assistant coaches and then appellant. Head coach Simpson informed appellant that Mr. Pusateri instructed head coach Simpson to suspend both assistant coaches based on allegations that they were involved in a sexual assault of a player on the team bus during the Memphis trip.
 {¶ 6} There was a lacrosse game scheduled for the evening of April 17, 2006, and although he attempted to obtain additional information from Mr. Pusateri about the allegations, appellant was unsuccessful. Prior to the lacrosse game, there was a pre-game team meeting in a locker room at the high school. While pre-game team meetings are standard procedure, the discussion of personal matters, or anything outside of the "game plan" was not. The intimidation charge at issue arises from appellant's actions and comments at this team meeting. According to the testimony, appellant entered the locker room and asked the team, by way of raising their hands, who "had fingers stuck up his butt." (Tr. at 20.) Mr. Long raised his hand. According to Mr. Long, appellant "singled" him out, and said that Mr. Long "would have to go to court and testify that it had happened, because he was going to resist any charges that would have been brought up." (Tr. at 20, 21.) Mr. Long stated that appellant was "intensely staring" at him, and "seemed really on edge," and "really intense." Id. at 21. Though he was not threatened and "not necessarily fearing for [his] life[,]" Mr. Long testified that he was "intimidated." (Tr. at 39.) According to Mr. Long, appellant said "if I went through with this, then he would be adamant about taking it to court." (Tr. at 38.) When asked why he felt intimidated Mr. Long stated: *Page 4 
 Because of the way — more or less his demeanor, his mannerisms and also how he felt. He came across more or less threatening when they said I am going to take you to court over this or you are going to have to testify. That was kind of an intimidating thought. * * *
(Tr. at 42.)
 {¶ 7} David Schnese, the team captain, testified that appellant asked if someone could raise their hand if they remember either of the assistant coaches touching them inappropriately. When Mr. Long raised his hand, appellant asked if it was true and Mr. Long said that it was. Appellant asked "Do you know that you are going to have to testify to this in court?" (Tr. at 59.) Mr. Schnese also stated that after Mr. Long raised his hand, appellant's demeanor changed. Mr. Schnese stated:
 You could tell that Frank became a little more fired up and agitated that somebody had actually raised their hand, that that had actually taken place, like he almost could not believe that something like that would have happened.
(Tr. at 72.)
 {¶ 8} According to Mr. Schnese, it appeared as if appellant was directing his comments towards Mr. Long himself. When asked to describe what he meant that appellant was "fired up" Mr. Schnese testified:
 Raised voice, just — It's almost too hard to explain, but it is not like — just the tone of his voice and how you felt like he was like directing the comment toward J.T. himself.
Id. at 73. When asked on cross-examination if he ever felt threatened by appellant when appellant was "fired up," Mr. Schnese responded, "Not before that meeting." Id. at 68.
 {¶ 9} Another team member, Anthony Brusadin was present in the locker room and testified that he remembers discussing the Tennessee trip and appellant saying "that *Page 5 
we were going to have to go and testify in court for it." (Tr. at 79.) Mr. Brusadin also remembered appellant stating that there would be consequences for lying, but Mr. Brusadin was unclear as to whether appellant said they could go to jail for lying. Mr. Brusadin testified that it seemed as if "they were kind of singling [Mr. Long] out and pointing that he would have to go to court and testify." (Tr. at 81.)
 {¶ 10} Two additional teammates, Kyle Dougherty and Jordan Bowdy testified for appellant. Both were present at the team meeting at issue. Mr. Dougherty remembers appellant asking if Mr. Pentz "put his fingers up their butt." (Tr. at 200.) After pausing, Mr. Long admitted that he had. Mr. Dougherty recalled appellant saying "you may have to testify in court." (Tr. at 201.) Mr. Dougherty's perception was that appellant was upset and angry, but not at the team. According to Mr. Dougherty, appellant said "this will probably ruin his dreams but not to let it ruin ours." Id. Although he believed appellant was speaking to the team as a whole at first, Mr. Dougherty thought appellant "kind of singled out [Mr. Long] and was speaking just to him." (Tr. at 202.)
 {¶ 11} Mr. Bowdy testified that appellant and head coach Simpson seemed upset about the whole situation in general, but not angry with the players. Mr. Bowdy testified that the statement he gave to the police after the team meeting was that "[t]hey told us the school was doing an investigation into the incident and that the police were going to be involved, as well." (Tr. at 218.)
 {¶ 12} Following the bench trial, the trial court found appellant guilty of knowingly attempting to intimidate a victim of crime in the filing or prosecution of criminal charges in *Page 6 
violation of R.C. 2921.04(A). Appellant was sentenced to pay a $1,000 fine, plus court costs. On appeal, appellant brings three assignments of error for our review:
 I. The trial court erred in its application of the elements of O.R.C. § 2921.04(A).
 II. The trial court based its decision on elements not in evidence.
 III. The trial court incorrectly applied the mental state for O.R.C. § 2921.04(A).
 {¶ 13} In his first assignment of error, appellant contends the trial court erred in its application of the elements of R.C. 2921.04(A). Under this assignment of error appellant challenges the trial court's interpretation of "to intimidate or hinder" and the sufficiency of the evidence.
 {¶ 14} R.C. 2921.04, provides, in relevant part:
 (A) No person shall knowingly attempt to intimidate or hinder the victim of a crime in the filing or prosecution of criminal charges or a witness involved in a criminal action or proceeding in the discharge of the duties of the witness.
 (B) No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness.
 {¶ 15} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C.2901.22(B). *Page 7 
 {¶ 16} Appellant was charged under subsection (A). Appellant contends that pursuant to the Supreme Court of Ohio's definition of intimidation provided in State v. Cress, 112 Ohio St.3d 72, 2006-Ohio-6501, intimidation involves threats and the creation of fear in the victim, and that the evidence here does not rise to that level.
 {¶ 17} It is appellee's position that Ohio law indicates neither threats nor fear of physical harm are necessary to sustain a conviction under R.C. 2921.04(A), as said provision states a defendant is guilty if he or she knowingly attempts to intimidate or hinder a crime victim. Additionally, appellee argues appellant's reliance on Cress is misplaced as Cress concerned subsection (B) of R.C. 2921.04, rather than subsection (A), and Cress does not stand for the proposition stated by appellant. Our reading of Cress is consistent with the view expressed by appellee.
 {¶ 18} The question before the Supreme Court of Ohio in Cress was "[d]oes a criminal charge of intimidation in violation of R.C.2921.04(B) require the state to prove that the defendant has made a threat to engage in unlawful conduct?" Id. at 72. In Cress, after the couple had an argument, Cress entered his girlfriend's apartment without permission by accessing the attic crawl space that connected their two apartments. Cress' girlfriend, the victim, heard noises in the bedroom and discovered Cress in the closet. The victim called the police and Cress returned to his apartment. After gaining a search warrant for Cress' apartment, Cress was arrested. Within hours of his arrest, Cress called the victim from jail and stated, in essence, that if the victim would refrain from getting Cress in trouble, he would not disseminate photographs of her and others *Page 8 
smoking a bong. Cress also admitted he was using the photographs as a "scare tactic" against the victim. Id. at 73.
 {¶ 19} A jury found Cress guilty of intimidation in violation of R.C.2921.04(B). The Third District Court of Appeals reversed the conviction concluding that the term "unlawful threat of harm" contained in R.C.2921.04(B) required proof that a specific threat be, in and of itself, a threat to commit an unlawful act." Id. at 75. The Supreme Court of Ohio disagreed, and the court stated:
 Significantly, a violation of R.C. 2921.04(B), involving force or an "unlawful threat of harm," constitutes a felony of the third degree, while violation of R.C. 2921.04(A) constitutes a misdemeanor of the first degree. R.C. 2921.04(D). Where, as in this case, the use of force to intimidate a witness is not alleged, the statute distinguishes between felony witness intimidation and misdemeanor witness intimidation by the presence of an unlawful threat of harm. We must therefore determine from the words of the statute the General Assembly's intent in adding the term "unlawful threat of harm" in R.C. 2921.04(B) to describe those instances of witness intimidation properly found to be felonious.
 In interpreting the phrase "unlawful threat of harm" in R.C. 2921.04(B), the opinion in the Third District Court of Appeals stated, "Without a showing of an express or implied threat of unlawful conduct, there can be no finding that Cress is guilty of intimidation." But the word "threat" is defined as "an expression of an intention to inflict evil, injury, or damage on another usu[ally] as retribution or punishment for something done or left undone." Webster's Third New International Dictionary (1986) 2382. It connotes almost any expression of intent to do an act of harm against another person irrespective of whether that act is criminal. State v. Moyer (1920), 87 W.Va. 137, 104 S.E. 407
("The word `threat' is very broad and indefinite. It includes almost any kind of an expression of intention of one person to do an act against another. Ordinarily, it signifies intention to do some sort of harm, but the realm of injury is equally broad and undefined. All wrongs are not criminal offenses"). *Page 9 
 A witness threatened with perfectly legal conduct ("I will tell your spouse about our affair") may be more intimidated than a witness threatened with illegal conduct ("I will knock down your mailbox"). The most intimidating threat of all may be an indefinite one ("You'll be sorry"). We therefore reject the contention that the General Assembly intended to differentiate between felonious witness intimidation and misdemeanor intimidation based on the legality of the threatened conduct, particularly when that construction is contrary to the rule of grammar that an adjective, here "unlawful," modifies the noun that follows it, here "threat." The General Assembly did not provide a definition of the term "unlawful threat," and we presume that it intended that the term be given its common meaning in accordance with the general rules of grammar.
 * * *
 Both R.C. 2921.04(A) and (B) prohibit knowing attempts to intimidate a witness. We cannot hypothesize an instance in which the act of threatening a witness would not also constitute intimidation. The term "threat" represents a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct. See Planned Parenthood League of Massachusetts, Inc. v. Blake (1994), 417 Mass. 467, 474, 631 N.E.2d 985 (defining "threat" as "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"). To "intimidate" means to "make timid or fearful: inspire or affect with fear: frighten * * *; esp.: to compel to action or inaction (as by threats)." (Emphasis added and capitalization omitted.) Webster's Third New International Dictionary at 1184.
 "Intimidation" by definition involves the creation of fear in a victim, and the very nature of a threat is the creation of fear of negative consequences for the purpose of influencing behavior. We simply do not discern a meaningful difference between intimidation of a witness and the making of a threat to a witness. Accordingly, both R.C. 2921.04(A) and (B) prohibit the threatening of witnesses.
Id. at 76-77. *Page 10 
 {¶ 20} While the court said it did not "discern a meaningful difference" between intimidation of a witness and making a threat to a witness, when read in context, we find the court was noting that essentially any threat would constitute intimidation. However, the reverse, that intimidation requires a threat, is not implicit in their statement, especially in light of the court's additional commentary that intimidation, by definition, involves the creation of fear in a victim. Our perception of the court's reference is bolstered by the court's holding "that the statutory language in R.C. 2921.04(B), proscribing intimidation by an `unlawful threat of harm,' is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law." Id. at 77-78 (emphasis added).
 {¶ 21} Thus, while Cress is instructive for purposes of defining intimidation by unlawful threat of harm under R.C. 2921.04(B), we do not find it dispositive to the issue before us, nor do we find that it stands for the proposition advanced by appellant. As previously noted, R.C. 2921.04(A) states a defendant is in violation of said provision if he or she knowingly attempts to intimidate or hinder a crime victim. There is no requirement of a threat. Further, Cress states that "to `intimidate' means to `make timid or fearful: inspire or affect with fear: frighten * * *; esp.: to compel to action or inaction (as by threats)." Id. at 77. In fact, in his reply brief, appellant states that by definition, "intimidation requires a threat or the creation of fear." (Reply Brief at 3, emphasis added.) While the majority of fact patterns concerning R.C. 2921.04(A) that we have reviewed do contain overt threats, we are not aware of an appellate court that, to date, hasrequired the making of a threat in order to sustain a conviction under R.C. 2921.04(A). For *Page 11 
instance, this court recently sustained a conviction under R.C.2921.04(A), wherein the defendant called his estranged girlfriend from jail where he was being held on a domestic violence charge and left the following message on her voicemail:
 You gotta tell `em I didn't do anything. Tell `em I didn't touch you[.] * * * All you gotta do is tell `em I didn't do anything, Erin.
 {¶ 22} State v. Stanley, Franklin App. No. 06AP-65, 2006-Ohio-4632, at ¶ 15. According to the victim in Stanley, she felt as if the defendant was pressuring her and attempting to get her to change her story. InStanley, there does not appear to have been an accompanying threat, yet, based on the testimony, this court concluded that any rational trier of fact could have found the essential elements of intimidation contained in R.C. 2921.04(A) proven beyond a reasonable doubt. See, also,State v. Sessler, Crawford App. No. 3-06-23, 2007-Ohio-4931 (noting that a conviction under R.C. 2921.04(A) did not require proof of force or threat of harm); State v. Munz (Feb. 21, 2002), Cuyahoga App. No. 79576, 2002-Ohio-675 (conviction under R.C. 2921.04 upheld where the defendant called the victim of his domestic violence charge and said he would commit suicide if she continued with the charges); State v.Williams (June 1, 2001), Ashtabula App. No. 2000-A-0005 (conviction under R.C. 2921.04[B] affirmed where the defendant called the victim of a rape charge in which the defendant's best friend was being held and the defendant asked for "$3000 to get a friend out of jail" and then stated that he would kill the victim when she indicated she would not give him the money); State v. Bates (Mar. 30, 2001), Portage App. No. 99-P-0100 (conviction under R.C. 2921.04[A] affirmed where the defendant enlisted the aid of a fellow Deputy Sheriff to "talk" to a witness in the defendant's son's felonious assault case and "let [the witness] know that *Page 12 
she could be facing criminal charges for serving alcohol to underage kids"); State v. Greenberg (Mar. 21, 1997), Delaware App. No. 96CA-A-05-029 (conviction under R.C. 2921.04(A) affirmed where the defendant called the victim and said "he was going to `. . . fucking k . . .,'" and though the victim hung up, she believed the defendant was threatening to kill her).
 {¶ 23} Upon review of the record and established case law, we find no error in the trial court's interpretation of "to intimidate or hinder," as used in R.C. 2921.04(A). We now turn to appellant's argument regarding the sufficiency of the evidence.
 {¶ 24} As set forth in State v. Jenks (1991), 61 Ohio St.3d 259, when reviewing the sufficiency of the evidence supporting a criminal conviction, an appellate court must examine the evidence submitted at trial to determine whether such evidence, if believed, would convince an average person of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. at paragraph two of the syllabus. See, also, Jackson v.Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781.
 {¶ 25} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172. Rather, the sufficiency of the evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, supra, at 319. Accordingly, the reviewing court does not substitute its judgment for that of the fact finder. Jenks, supra, at 279. *Page 13 
 {¶ 26} Appellant contends the victim was not threatened by appellant, was not afraid of appellant, and that no team players were threatened or fearful during the team meeting in question. Appellant further contends there is no evidence that he made any statements to the alleged victim in an attempt to discourage the victim from future involvement with criminal proceedings. Therefore, appellant asserts the evidence was insufficient to sustain the conviction for intimidation.
 {¶ 27} Appellee suggests that when construed in appellee's favor, the evidence is clearly sufficient to establish an intimidation attempt under R.C. 2921.04(A).
 {¶ 28} In support of his position, appellant cites to this court's decision in State v. Jackson, Franklin App. No. 02AP-867,2003-Ohio-6183, wherein this court reversed a conviction under R.C.2921.04(B) for sufficiency of the evidence. In Jackson, the defendant was charged with aggravated arson after he started a fire on the balcony of an apartment he shared with his girlfriend. While incarcerated, appellant called his girlfriend, but her friend Barrows answered the phone and would not let appellant speak to his girlfriend. Barrows testified that Jackson stated "tell Shelia I'm going to kill her when I get out of here" and that he was "going to make her life a living hell when I get out of here." Id. at ¶ 53. Barrows testified that she believed appellant may simply have been expressing his frustration at being in jail rather than threatening anyone. Finding no nexus between the threats and defendant's desire to intimidate his girlfriend so that she would refrain from cooperating with the prosecution, this court reversed the conviction.
 {¶ 29} In the case at bar, appellant's comments were made directly in response to Mr. Long admitting inappropriate conduct by the assistant coaches, one of whom being *Page 14 
appellant's son, while knowing that because of the allegations a criminal investigation would have been initiated. Thus, even applyingJackson's standard, there is clearly "some evidence of a nexus" to sustain appellant's conviction. Consequently, we do not findJackson to be either applicable or dispositive. See, also,Williams, supra (noting that the culpable mental state is knowledge and that it is sufficient under R.C. 2921.04(A) that the actor "knows that his conduct is likely to hinder or intimidate").
 {¶ 30} The testimony revealed that the pre-game team meeting is mandatory if a player wants to play in the game. Team meetings had routinely consisted only of game plans, and personal matters had never been addressed until the meeting held on April 17, 2006. Appellant was aware of the allegations against his son and Mr. Pentz, and appellant admitted he knew that based on such allegations, a criminal investigation would have been initiated. Appellant and head coach Simpson were the only authority figures present in the meeting. After raising his hand in response to appellant's question about having "fingers stuck up his butt," Mr. Long testified that appellant became agitated, singled Mr. Long out, and stated that he would have to testify in court and that any charges would be "resisted." Other team members perceived that after Mr. Long raised his hand, appellant became more agitated and singled Mr. Long out. Others testified that appellant stated the allegations would have to be testified to in court and that there are consequences for lying. Based on appellant's mannerisms, words, and demeanor, Mr. Long testified that he was intimidated by appellant. Another team member described Mr. Long as visibly shaken and on the verge of breaking down. *Page 15 
 {¶ 31} Viewed in a light most favorable to the state, as is required, we find that any rational trier of fact could have found the essential elements of the intimidation contained in R.C. 2921.04(A) proven beyond a reasonable doubt, and as such, we find there is sufficient evidence to sustain appellant's conviction.
 {¶ 32} For the foregoing reasons, appellant's first assignment of error is overruled.
 {¶ 33} In his second assignment of error, appellant contends the trial court based its decision on "elements" not contained in evidence. Specifically, appellant challenges the trial court's following statements that we have italicized for distinction:
 There are many troubling aspects of the fact patter presented in this case. I have looked at all of the facts of this case frequently since we were last together. I have placed myself in the shoes of JT and the Simpsons. Several elements of the locker room meeting stand out to me. These include the following: The power disparity between adult coaches and high school boys; the family relationship between the accused coaches and our defendants; the male culture of stoicism at play; the humiliation of having one's private parts violated, in a group no less; the fragility of an adolescent's sense of self and/or sexual identity; a teen's desire to just be normal and fear of ostracism and public ridicule. This is our background in this case.
 It's clear from JT Long's testimony that he had a storm of emotions at play on the April day of that locker room meeting. Many of those emotions were fed by realistic fears, fears of such nature that that would nearly overwhelm a teenager. This is the classic stressed crime victim, only in this case it is a high school boy. This is the teenager that the coaches called out in that locker room. Requiring anything of the team that night beyond playing a game was ill advised. As coaches the Simpsons should have known that. Perhaps under circumstances they should not have been placed in such proximity to the team.
(Feb. 5, 2007 Tr. at 30-31; emphasis added.) *Page 16 
 {¶ 34} According to appellant, the trial court does not have free reign to consider elements and factors that are not in evidence, and it is clear the trial court based its decision on elements unsupported by the record. We disagree.
 {¶ 35} "Under Ohio law, `the usual presumption is that in a bench trial in a criminal case the trial court considers only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'" State v. Copley, Franklin App. No. 04AP-1128, 2006-Ohio-2737, discretionary appeal not allowed by111 Ohio St.3d 1432, 2006-Ohio-5351, at ¶ 27, quoting State v. Klempa, Belmont App. No. 01 BA 63, 2003-Ohio-3482, at ¶ 15, citing State v.Post (1987), 32 Ohio St.3d 380, 384.
 {¶ 36} The language to which appellant refers consists of less than two paragraphs taken from the trial court's eight page discussion leading up to its rendering of the verdict. Immediately following the portion of the transcript at issue, the trial court began discussing the charge, what the law requires, prior precedent from various Ohio appellate courts, and the transcript, including specific quotes from Mr. Long, Mr. Schnese, Mr. Brusadin, as well as the defense witnesses. The trial court then again discussed the legal definitions at issue, and finally rendered its verdict. The language challenged by appellant, when read in context, reveals to us, not what the trial court relied on in making its decision, but rather reveals the trial court's perception of the surroundings and the atmosphere of the team meeting based upon the testimony at trial.
 {¶ 37} There is an obvious power disparity between authority figures, such as teachers and coaches, and the high school students under their charge. This is bolstered by the team members' testimony that "you can't talk back to a coach," the coaches are *Page 17 
"trusted" by the players, and the coaches are "authority" figures. (Tr. at 65, 221, 225.) As for the trial court's discussion wherein the trial court spoke in generalized terms regarding male stoicism, a fear of ostracism, and a sense of self, Mr. Long testified as to essentially each one of these. Mr. Long did not come forward about this incident on his own because he "was really embarrassed of it." (Tr. at 23.) Only after being troubled by the alleged incident did the team captain finally discuss it with his father. Further, Mr. Long stated that he did not want it in the news, or for his parents to find out about it because it "was pretty embarrassing." (Tr. at 24.) When the allegations were raised at the team meeting, Mr. Long said he played in the game that night because he did not want "to make more of a spectacle of [himself] maybe by leaving and maybe causing more questions to arise the next day at school from friends or, you know, players, or anything like that," and he just "wanted to be as normal" as he possibly could. (Tr. at 26.) The trial court's last statement with which appellant takes issue is regarding Mr. Long being a classic stressed crime victim. Again, we find this to be the trial court's perception based upon the evidence adduced at trial, not elements unsupported in the record and relied upon to make its decision as appellant suggests.
 {¶ 38} Upon review of the record, while the trial court spoke in general terms during its introduction, it appears to this court that the trial court was merely setting forth its perception of the circumstances and the surrounding atmosphere based on the evidence presented at trial. Thus, we find that appellant has failed to rebut the presumption that the trial judge, sitting as trier of fact, understood the applicable rules and *Page 18 
did not rely on evidence not contained in the record. Accordingly, appellant's second assignment of error is overruled.
 {¶ 39} In his final assignment of error, appellant contends the trial court incorrectly applied the mental state for R.C. 2921.04(A). Specifically, appellant argues his testimony demonstrates that he did not "intend" to intimidate or scare Mr. Long, nor did he threaten anyone at the team meeting at issue. Appellant asserts the trial court disregarded his testimony about his intentions with respect to the team meeting, and focused solely on Mr. Long's interpretation of the same. Appellant's argument is not well-founded.
 {¶ 40} Initially, we note that we have already determined through disposition of appellant's first assignment of error that there is sufficient evidence in the record to sustain appellant's conviction under R.C. 2921.04(A).
 {¶ 41} Secondly, the transcript does not support appellant's position, but rather belies it. The trial court acknowledged that the requisite mental state is "knowingly," and recognized that "purpose or intent is not an element of this case." (Feb. 5, 2007 Tr. at 36.) Moments later, the trial court reiterated, "[s]o again, let me repeat. Purpose is not involved here." Id. Further, the transcript reveals the trial court's reference to the testimony of not only Mr. Long, but other witnesses as well.
 {¶ 42} Lastly, it is well established that the determination of weight and credibility of the evidence is for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, *Page 19 
at ¶ 58; State v. Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. The trier of fact is free to believe or disbelieve all or any of the testimony. State v. Jackson (Mar. 19, 2002), Franklin App. No. 01AP-973;State v. Sheppard (Oct. 12, 2001), Hamilton App. No. C-000553.
 {¶ 43} We have reviewed the record, and upon such review, we cannot find that the trial court erred in resolving issues of credibility or incorrectly applied the legal standard. Consequently, we overrule appellant's third assignment of error.
 {¶ 44} For the foregoing reasons, appellant's three assignments of error are overruled and the judgment of the Franklin County Municipal Court is hereby affirmed.
Judgment affirmed.
 FRENCH, J., concurs. WHITESIDE, J., concurring separately.
WHITESIDE, J. retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.