Planned Parenthood League of Massachusetts, Inc. *v.* Blake.

PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS, INC.,
& others[1] *vs.* KEVIN BLAKE & others.[2]

Middlesex. December 7, 1993. - April 11, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Practice, Civil,* Standing. *Abortion. Injunction. Civil Rights,* Availability
of remedy, Coercion. *Identification. Words,* "Threats," "Intimidation,"
"Coercion."

In an action in which the Attorney General had standing to seek injunctive
relief under the provisions of the Massachusetts Civil Rights Act, G. L.
c. 12, §§ 11H and 11I, it was not necessary for this court to decide
whether certain other plaintiffs also had standing. [472]

In an action seeking injunctive relief under the Massachusetts Civil Rights
Act, G. L. c. 12, §§ 11H and 11I, the judge, in granting the relief
sought, concluded that the defendants' conduct in knowingly trespass-
ing on the property of clinics that provided abortion counseling and ser-
vices, and in intentionally using their bodies or Kryptonite bicycle locks,
or both, to prevent others physically from entering, leaving or using
medical facilities to obtain abortions to which they were constitution-
ally and lawfully entitled, constituted threats, intimidation, and coer-
cion within the meaning of the act and was an actual or potential physi-
cal confrontation accompanied by the threat of harm; further, the judge
was warranted in finding, and correct in ruling, that a reasonable wo-
man seeking abortion services would be made fearful and apprehensive
and would feel pressured by the defendants' conduct so that she would
desist from seeking those services while that conduct continued. [473-
476]

[1]Preterm, Inc., Repro Associates, Inc., Crittenton Hastings House,
Stanton P. Goldstein, Rebecca Roe, Barry Adler doing business as
Gynecare, and the Commonwealth through the Attorney General and as
an intervener. The remaining original plaintiffs, except for Rebecca Roe,
are providers of abortion services.

[2]Sean Brogan, Mary Kelliher, John D. McCarthy, Jr., and Mortimer
O'Shea. None of the other defendants, including Operation Rescue:
Boston, Pro-Life Action Network of Arlington, and numerous individuals,
has appealed.

In an action brought under G. L. c. 12, §§ 11H and 11I, the judge properly rejected the defendants' attempts to identify the women affected by the defendants' conduct in "blockading" facilities providing abortion counseling and services, none of whom were called as witnesses by the plaintiffs, where there was no reasonable risk in the circumstances that nondisclosure had prejudiced the defendants' case and where the intrusion on the privacy rights of those women would have been substantial. [476-479]

An injunctive order requiring certain defendants to refrain from "aiding or abetting directly or indirectly" persons who engage in specific prohibited acts was not unconstitutionally vague. [480-481]

O'CONNOR, J., with whom NOLAN and LYNCH, JJ., joined, dissenting, expressed the view, previously expressed in *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701 (1990), that the injunctive relief granted was constitutionally overbroad and should be vacated. [482-483]

CIVIL ACTION commenced in the Superior Court Department on April 19, 1989.

The case was heard by *Peter M. Lauriat*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Francis H. Fox* (*Robert A. Miley & Wendy A. Miklus* with him) for Kevin Blake & others.

*Judith E. Beals*, Assistant Attorney General (*Donna L. Palermino*, Assistant Attorney General, with her) for the Attorney General.

*John H. Henn* (*Teresa A. Martland* with him) for Planned Parenthood League of Massachusetts, Inc., & others.

*Cornelius J.P. Sullivan*, for William Cotter & another, was present but did not argue.

*Janet Benshoof, Catherine Albisa & Priscilla J. Smith*, of New York, for Center for Reproductive Law & Policy, amicus curiae, submitted a brief.

*Nonnie S. Burnes & Sarah R. Wunsch*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

WILKINS, J. The five defendants appeal from an amended judgment that permanently enjoined them, among other things, from obstructing access to any facility in the Com-

monwealth that provides abortion counseling or services and from using force against persons entering or leaving or working at any such facility.

In April, 1989, the plaintiffs commenced this action pursuant to the Massachusetts Civil Rights Act (MCRA) (G. L. c. 12, §§ 11H & 11I [1992 ed.]).[3] In April, 1990, the Attorney General was allowed to intervene in the name of the Commonwealth. The case was tried on a joint amended complaint stating a single claim under the MCRA and seeking a permanent injunction in accordance with G. L. c. 12, §§ 11H, 11I, & 11J (1992 ed.).[4] In the final judgment the judge dismissed the claims of certain plaintiffs and dismissed claims against many individual defendants. The injunction

___

[3] These sections read as follows:

"Section 11H. Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured. Said civil action shall be brought in the name of the commonwealth and shall be instituted either in the superior court for the county in which the conduct complained of occurred or in the superior court for the county in which the person whose conduct complained of resides or has his principal place of business."

"Section 11I. Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court."

[4] In *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701 (1990), this court considered certain questions concerning a preliminary injunction entered in this case and upheld various challenges to that preliminary injunction. In *Commonwealth* v. *Cotter*, 415 Mass. 183 (1993), and *Commonwealth* v. *Brogan*, 415 Mass. 169 (1993), this court affirmed convictions for the violation of that preliminary injunction, the operative terms of which appear in the *Brogan* opinion. See *id.* at 170 n.1.

whose entry is challenged in this appeal was entered against Operation Rescue: Boston, Pro-Life Action Network of Arlington, and numerous individuals, including the five appellants. We allowed the defendants' application for direct appellate review.

The defendants make three substantive challenges to the permanent injunction, which we shall consider in turn after commenting briefly on the standing of the Attorney General and the other plaintiffs to maintain this action. First, however, we set forth certain findings of fact that are typical of the circumstances that led the trial judge to rule that the defendants had violated the MCRA and should be permanently enjoined.

Operation Rescue: Boston and Pro-Life Action Network organized and encouraged participation in what they call "rescues," blockades or invasions of abortion clinics. They offered advice, training, and seminars to prepare participants in "rescues" for arrest, jail, and money judgments. The purpose of a "rescue" is to keep women out of an abortion clinic and to prevent abortions from taking place at that clinic. The judge found that on nine dates between August 30, 1989, and January 17, 1991, anti-abortion demonstrators blocked entrances or physically invaded abortion clinics or buildings housing abortion clinics in the Commonwealth. These "rescues" occurred in Hyannis, Boston, Brookline, New Bedford, Worcester, and Springfield, and involved six abortion clinics. In each of these instances, the blocking or invading demonstrators remained on private property after they had been notified that they were trespassing.

It would prolong this opinion unnecessarily to recite all the facts of each incident. As an example, we describe the August 10, 1990, blockade of Preterm Health Services, Inc. (Preterm), a clinic located on Beacon Street in Brookline, in which each of the defendants participated. From 6:40 A.M. until 8:30 A.M. on that day, a group of about twenty people sat with their backs up against the front door of the building that housed the clinic. It was not possible to open that door. Another group sat with their backs against the rear public

entrance to the building, preventing the door from being opened. The defendants were advised that they were trespassing. Brookline police officers read the preliminary injunction to the groups at the two doors and demanded that they leave. Shortly after 8:20 A.M., Brookline police began removing the persons blocking access to the building. During the period of the blockade most patients and staff could not enter the building. A few patients entered the building through the garage or the back door during a brief period when that door was not blocked. Those patients who entered after 8:50 A.M. "appeared to be very upset — they were crying and shaking and holding on tightly to others as they walked into the clinic. Their demeanor differed markedly from the usually calm demeanor of patients entering Preterm on days when many picketers but no blockaders were present outside Preterm." When the police finally cleared the front door of protesters, a crowd of patients entered the building. They appeared upset; they were crying, breathing heavily, and shaking.[5]

Each of the defendants before us participated in the occupation of a portion of the medical area of a clinic. We recite one typical example, in which the defendants Brogan and O'Shea participated on January 17, 1991, at Womancare of New Bedford. The doors to the medical area of the clinic were kept locked. A woman who pretended to be a patient was able by a ruse to have the doors unlocked, and fifteen to twenty people rushed into the medical area of the clinic, dragging a protesting clinic employee along with them where she was pushed up against a wall. One group of invaders sat with their backs to each other in one examining room, locked together with Kryptonite bicycle locks around their necks.

---

[5]On August 23, another blockade occurred at Preterm in which all the appellants except Blake participated. On this occasion, two Kryptonite locks were placed on the outside of the rear doors of the building and four such locks were placed on the gates to the private garage in the building. Patients whose procedures were delayed were crying and tense when they reached the clinic. "They were concerned for their privacy and confidentiality."

Another group of six lay on the floor extending into the entrances of two other examining rooms, locked together by a series of Kryptonite bicycle locks around their necks. Three of these people also wore at their ankles a modified Kryptonite bicycle lock encased in a welded steel pipe in such a way that a locksmith found it impossible to reach the lock until the fire department cut the casing. No scheduled abortions were performed that day. A patient who was in the clinic when the incident started was extremely upset. The police ultimately removed the intruders.

1. The defendants correctly grant that the Attorney General has standing to maintain this action (see G. L. c. 12, § 11H), but argue that no other plaintiff has.[6] We need not decide the standing of the other plaintiffs, a question which involves in part the right of a doctor or an abortion clinic to argue the constitutional rights of patients.[7] The trial judge made limited findings on the question whether the clinics sustained harm in their own right from the defendants' conduct. If they did, they could have standing to maintain this action on their own behalves. As we have said, however, the standing of the Attorney General supports the maintenance of this action. We, therefore, turn to the defendants' substantive challenges to the judgment entered against them.

---

[6]The action should have been dismissed as to Rebecca Roe, a fictitious person. See *Doe* v. *The Governor*, 381 Mass. 702, 705 (1980). The plaintiffs conceded the point at trial.

[7]The Supreme Court of the United States divided evenly on this point in *Singleton* v. *Wulff*, 428 U.S. 106, 113-118 (1976). See *id.* at 131 (Powell, J., dissenting). Lower Federal courts have generally held that abortion providers have standing to assert the rights of their patients who are not parties to the action. See, e.g., *New York State Nat'l Org. for Women* v. *Terry*, 886 F.2d 1339, 1347-1348 (2d Cir. 1989), cert. denied, 495 U.S. 947 (1990); *Planned Parenthood Ass'n of Cincinnati* v. *Cincinnati*, 822 F.2d 1390, 1394-1396 (6th Cir. 1987).

We need not decide whether the doctor or the clinics have standing under the law of the Commonwealth (see *Slama* v. *Attorney Gen.*, 384 Mass. 620, 624-625 [1981]), or whether this question is irrelevant if they have standing under Federal law.

2. The defendants' conduct amounted to threats, intimidation, and coercion within the meaning of those words in G. L. c. 12, § 11H. The defendants grant that they sat in clinics and in clinic doorways and thereby delayed or prevented abortions. This, they argue, cannot establish liability under the MCRA, because their conduct did not interfere with, or attempt to interfere with, anyone's rights "by threats, intimidation or coercion." G. L. c. 12, § 11H.

The defendants first say that their conduct was a direct frustration of the rights of others, and that a "direct violation of a person's rights does not by itself involve threats, intimidation, or coercion." *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 333 (1989). See *Nicholas B.* v. *School Comm. of Worcester*, 412 Mass. 20, 24 (1992); *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 158 (1989); *Pheasant Ridge Assoc. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 781 (1987). Each of these cases involved direct action against the plaintiff which "by itself" (*Longval, supra*) did not amount to a violation of the MCRA. If, however, direct action also includes threats against, or intimidation or coercion of, a particular individual or individuals, liability under the MCRA can be established, and will be established if such threats, intimidation, or coercion interfered with that individual's exercise or enjoyment of rights secured by law. The judge correctly concluded that this case involved more than simple direct action in denial of the rights of women seeking abortion services.

The defendants next claim that the facts do not show an actual or potential physical confrontation accompanied by a threat of harm, proof of which has been an element of MCRA claims. See *Willitts* v. *Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210 (1991); *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction, supra* at 158; *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 719-720 (1989).[8] In such circumstances a threat, intimidation, or co-

---

[8]The Massachusetts Civil Rights Act was enacted in response to deprivations of secured rights by private individuals using violence or threats of

ercion, interfering with secured rights gives rise to a MCRA violation. There is no doubt that the defendants' conduct involved physical confrontations accompanied by threats of harm.

This court has not adopted a comprehensive definition of the words "threats, intimidation or coercion." The trial judge defined the words in terms that we accept. "Threat" in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. See *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 104 (1987) (O'Connor, J., dissenting); *Delaney v. Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 409 (1989) ("acts or language by which another is placed in fear of injury or damage"). Cf. *Commonwealth v. Ditsch*, 19 Mass. App. Ct. 1005 (1985) (reasonable apprehension on the part of the recipient of a criminal threat). "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. See *Redgrave v. Boston Symphony Orchestra, Inc.*, *supra*; *Delaney v. Chief of Police of Wareham*, *supra* ("creation of fear to compel conduct"). In *Deas v. Dempsey*, 403 Mass. 468, 471 (1988), we quoted a definition of coercion from Webster's New International Dictionary at 519 (2d ed. 1959): "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." See *Delaney v. Chief of Police of Wareham*, *supra* ("the active domination of another's will").

In the context of this case, the judge correctly applied the objective standard of whether a reasonable woman seeking abortion services would be threatened, intimidated, or co-

---

violence amounting to racial harassment. Our cases holding that the Massachusetts Civil Rights Act was violated have involved actual or potential physical confrontations involving a threat of harm. *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 95 (1987), for example, involved potential threats to the physical safety of the audience and symphony players. Evidence of an actual or potential physical confrontation between two people (i.e., clinic staff and the defendants) that has the effect of depriving a third person (i.e., patients) of protected rights can sufficiently prove a violation of the MCRA. See *id.* at 100.

erced by the defendants' conduct. Cf. *Commonwealth* v. *DeVincent*, 358 Mass. 592, 593 (1971) ("the threat is to be tested objectively; the state of mind of the person threatened is not controlling"); *Commonwealth* v. *Ditsch, supra* (reasonable apprehension of criminal threats). The defendants do not challenge the use of this standard.

Based on these principles, the judge properly concluded that the defendants' conduct constituted threats, intimidation, and coercion. He made ultimate findings and drew reasonable inferences that the defendants knowingly trespassed on clinic property and intentionally used their bodies or Kryptonite bicycle locks, or both, to prevent others physically from entering, leaving, or using medical facilities to obtain abortions to which they were constitutionally and lawfully entitled. Their conduct "presented frightening, threatening and impermeable physical obstacles to patients attempting to enter the clinics, and forced those patients to forego their right to enter the clinics and obtain abortion services." "The patients reasonably perceived the crowding of a large number of bodies in a confined area of a medical facility as posing a risk of personal physical harm." "[T]he acts of trespassing and crowding into clinic waiting rooms, conference rooms, operating rooms and medical areas reasonably threatened and intimidated patients who were there awaiting services." "The defendants' actions were specifically designed to dissuade the patients from seeking the immediate care and treatment to which they were constitutionally entitled." The judge ruled properly that the defendants' conduct "constitutes the application of physical force to constrain the patients and staff of the plaintiff clinics from receiving and providing abortion services. Such conduct is coercive within the meaning of MCRA. The Court further finds that such conduct constitutes 'an actual or potential physical confrontation accompanied by the threat of harm.' "

"These actions were threatening, intimidating and coercive to patients who sought to enter and use the clinics' facilities. The defendants' physical confrontation of clinic patients and staff on numerous occasions in cities and towns across the

Commonwealth, even where no violence was involved, was designed, intended and highly likely to instill fear and concern for personal safety in a reasonable person seeking abortion services."[9] In these circumstances, the judge was warranted in finding, and was correct in ruling, that a reasonable woman seeking abortion services would be made fearful and apprehensive, and would feel pressured, by the defendants' conduct so that she would desist from seeking those services while that conduct continued.

3. The defendants claim error in the rejection of their various attempts to identify and then depose the patients with whose rights they had admittedly interfered. The defendants assert that they were entitled to have a chance to rebut the plaintiffs' case by offering testimony from patients whose scheduled procedures at blockaded clinics were delayed or postponed. The defendants' purpose was to show that the delays were not the result of threats, intimidation, or coercion perceived by the patients, but rather were the result of the reality that the clinics were effectively closed by the blockades.

As we have already noted, the standard is whether a reasonable woman would have felt threatened, intimidated, or coerced by the defendants' conduct. Therefore, unlike a criminal case in which proof of a victim's state of mind may be indispensable in making the prosecution's case (see, e.g., *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 816 [1973]), testimony concerning the states of mind of specific women who were unable to obtain abortions as planned was not essential to the plaintiffs' proof. We are not concerned here with the rights of a criminal defendant, but only with a civil

---

[9]"By contrast, the Court finds and concludes that lecturing, counselling, picketing, signing and praying at or near the clinics by certain defendants and their supporters, where the patients' access to the clinics was not obstructed or precluded, did not constitute threats, intimidation or coercion of the clinics' patients. So long as the defendants remain on public property and do not create physical barriers or promote physical confrontation or physical contact, then their activities cannot reasonably be perceived as threatening, intimidating or coercive in violation of MCRA."

action for an injunction with no claim by specific women for the award of damages. Because the Commonwealth undertook to prove its case through nonpatient witnesses who were present at the protests, no patient whose rights were allegedly interfered with testified. The denial before and during trial of attempts to identify such persons, therefore, did not impede the defendants' cross-examination of the plaintiffs' witnesses. On the other hand, any evidence that women who were unable to obtain abortions as scheduled did not feel threatened, intimidated, or coerced by the defendants' conduct would be relevant to the issue of the reaction of a reasonable woman in the circumstances. How actual participants responded to events could be a guide to how a reasonable person would react in the same circumstances.[10] Cf. *Commonwealth* v. *Matchett*, 386 Mass. 492, 500-501 (1982).

Although the defendants' relevancy contention is theoretically sound, in the circumstances of this case it lacks practical plausibility. The number of trespasses, the scores of scheduled abortions that were impeded, the physical intrusiveness of the blockaders, and the evidence of the reactions of patients and clinic personnel make it unlikely that the defendants would have discovered evidence from these women,

---

[10]Moreover, as a matter of discovery, the range of permissible inquiry is broad. See Mass. R. Civ. P. 26 (b), 365 Mass. 772 (1974); *Hickman* v. *Taylor*, 329 U.S. 495, 507 (1947), construing a cognate rule of Federal procedure.

None of the appellants, however, sought by pretrial discovery to learn the identities of the women who were affected by their conduct. They rely on a discovery request and an attempt to obtain a court order enforcing discovery from certain clinics filed by another defendant. No enforcement order was sought against the Attorney General who probably did not have any knowledge of which patients were affected by the defendants' conduct.

The defendants were thwarted in obtaining the same information by subpoena at trial. Among the facts agreed to by the Attorney General, the other plaintiffs, and the defendants in a joint pretrial memorandum was that: "Defendants in discovery have sought the identities of women who were scheduled to receive services at the clinics on the days in question and plaintiffs have declined to produce them." We shall assume in the defendants' favor that all aspects of their argument concerning the denial of information sought is before us.

whose lives they disrupted, that would have led the trial judge to factual conclusions other than those he reached. In other words, if there had been error on this issue, it would have created no reasonable risk that nondisclosure prejudiced the defendants. Cf. *Commonwealth* v. *Bishop*, 416 Mass. 169, 181 (1993), citing *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 57 (1987) ("[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome").

It was, in any event, within the judge's discretion whether to grant or deny the defendants' attempts to learn, by pretrial order and subpoena, the identities of the numerous women with whose rights they had interfered. Because no such woman testified at trial, the plaintiffs assumed the task of proving threats, intimidation, and coercion without testimony from the women concerning their states of mind.

The intrusion into the privacy rights of these women would have been substantial. The allowance of disclosure in cases such as this could have a discouraging impact on the bringing of actions to enforce rights under the MCRA and on a woman's exercise of her constitutional right to an abortion. See *Planned Parenthood of Southeastern Pa.* v. *Casey*, 112 S. Ct. 2791, 2829-2830 (1992) (disclosure through spousal notification invalid as an undue burden that "will operate as a substantial obstacle to a woman's choice to undergo an abortion"); *Thornburgh* v. *American College of Obstetricians & Gynecologists*, 476 U.S. 747, 766 (1986) ("A woman and her physician will necessarily be more reluctant to choose an abortion if there exists a possibility that her decision and her identity will become known publicly"), overruled on other grounds by *Planned Parenthood* v. *Casey*, *supra* at 2823; *Commonwealth* v. *Collett*, 387 Mass. 424, 428 (1982) ("If it becomes known that confidences are violated, other people may be reluctant"). Considering the likelihood that the defendants would obtain no evidence materially beneficial to them from women whose lives they

intentionally and admittedly disrupted and further considering that disclosure of the identity of these women would intrude into their privacy on a matter of constitutional right,[11] we conclude that the trial court did not abuse its discretion in denying disclosure of the identities of the women affected by the defendants' conduct.[12]

We add an observation, not essential to our conclusion on this issue, but supportive of it. The Attorney General, as a plaintiff in this action, represents the public interest in guarding against future violations of the MCRA. The Legislature has given him special standing to pursue injunctive relief in cases such as this. G. L. c. 12, § 11H. This action is brought solely to protect against future unlawful conduct that would be harmful to persons not currently identifiable. In such a case, the fact that the defendants' unlawful conduct if repeated would cause a reasonable woman in the circumstances to feel threatened, intimidated, or coerced requires prospective relief in the public interest.[13]

---

[11]The constitutional right of privacy concerns a person's interest both in avoiding disclosure of personal matters and in independence in making certain kinds of important decisions. See *Whalen* v. *Roe*, 429 U.S. 589, 599-600 (1977). Rejecting a claim that a New York law threatened these interests because it required the confidential filing and computer storage of information concerning the use of certain prescription drugs, the Court labeled as remote the possibility that judges would fail to protect attempts at unwarranted disclosures for evidentiary purposes. *Id.* at 601-602. The trial judge fulfilled the Supreme Court's expectations.

[12]For the same reasons, rejection of defendants' discovery attempts did not deny them due process of law.

We need not reach the question whether affected women who bring an action have a constitutional right to have their identities (and the fact that they had been pregnant and decided to obtain an abortion) kept in confidence in an injunction case like this. If this were an action seeking relief for harm done to an individual plaintiff or to a class of plaintiffs, the defendants' entitlement to information about those individuals would be quite different from their entitlement here. See *Western Elec. Co.* v. *Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976); *National Org. for Women* v. *Sperry Rand Corp.*, 88 F.R.D. 272, 274-275 (D. Conn. 1980).

[13]The fact that the Attorney General was given standing to represent the public interest in bringing a suit shows a desire to encourage compliance with the law in situations where individual plaintiffs are unlikely to come forward because of a perceived stigma associated with the activity of seek-

4. The defendants claim that a portion of the amended permanent injunction is constitutionally impermissible.[14] Their argument is directed to clause (c) of the injunction which was not included in the preliminary injunction that this court considered in *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701 (1990).[15] Clause (c) enjoins the defendants, individually and collectively, from "directing, instructing, conspiring with and/or [*sic*] aiding or abetting directly or indirectly any person, persons, groups or organizations who engage in any of the acts described in paragraphs (a) and (b) above."[16]

The defendants focus their argument on the words "aiding or abetting directly or indirectly any person . . . [or] groups . . . who engage in any of the acts described." They claim that the injunction improperly refers to "aiding *or* abetting" (emphasis added) rather than conjunctively to both; that the prohibition of "indirect" aiding or abetting is a "very vague notion"; that the reference to aiding or abetting "groups" invites guilt by association; and that the prohibition against

---

ing abortion services, because the duration of their involvement with the issue is transient, or because they cannot anticipate that this is an issue that will affect them in the future. Respecting the judge's decision to proceed without attempting to compel an appearance by patients as witnesses and allowing the injunction to stand is consistent with the outline of the MCRA and the Attorney General's role under it.

[14]We consider this point even though the defendants did not raise it in the trial court. The defendants do not dispute the plaintiffs' assertion that the defendants had opportunities to raise this challenge and did not do so.

[15]In the earlier case, the defendants argued unsuccessfully that the preliminary injunction violated their First Amendment rights because it (a) was impermissibly vague, (b) was overbroad because it prohibited constitutionally protected conduct, and (c) imposed an improper prior restraint on the defendants' right of free expression. *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue, supra* at 714-717.

[16]Clause (a) permanently enjoined trespassing, blocking, or obstructing access to or from any facility in the Commonwealth which provides abortion counseling or services. Clause (b) permanently enjoined physical restraining or obstructing or committing acts of force or violence against persons entering, leaving, or working at or seeking services from any such facility.

aiding or abetting blockading,[17] rather than against criminal activity itself, is vague.[18]

The complete answer to the defendants' claims is that clause (c), using the words "aiding or abetting," is modeled on traditional concepts of accessory liability which limit the scope of the injunction and identify those acts that are prohibited. See *Kyte* v. *Philip Morris Inc.*, 408 Mass. 162, 168-169 (1990) (aiding and abetting require proof that the defendant knew of its substantial, supporting role in an unlawful enterprise), *Commonwealth* v. *Sylvester*, 400 Mass. 334, 339 & n.6 (1987) (acquiescence and presence alone not enough). Any violator of the prohibition against aiding or abetting in clause (c) must share the mental state of the principal violator. See *Commonwealth* v. *Richards*, 363 Mass. 299, 307-308 (1973). Cf. *Commonwealth* v. *Adams*, 416 Mass. 558, 565 (1993). Because intentional conduct is the measure of a violation of the MCRA (see *Deas* v. *Dempsey*, 403 Mass. 468, 471 [1988]; *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 99 [1987]) and of clauses (a) and (b) of the injunction, proof of a violation of the "aiding or abetting" prohibition of clause (c) will require a showing of a defendant's intention to assist intentional conduct violative of clause (a) or clause (b), or both.

5. With the exception that the judgment should be vacated as to Rebecca Roe and the action dismissed as to her (see note 6 above), the amended permanent injunction, entered on October 28, 1991, is affirmed as applied to the defendants.

*So ordered.*

---

[17]The injunction does not use the word "blockading."

[18]The defendants cite for support two loyalty oath cases, in which the phrase "aid or abet" does not appear. See *Baggett* v. *Bullitt*, 377 U.S. 360 (1964); *Cramp* v. *Board of Pub. Instruction of Orange County*, 368 U.S. 278 (1961). They also rely on *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886 (1982), briefly suggesting that clause (c) presents a First Amendment overbreadth problem. It is in this latter respect alone that the defendants may assert the rights of others who might be affected by the injunction. See *Commonwealth* v. *Bohmer*, 374 Mass. 368, 371 n.6 (1978).

O'CONNOR, J. (dissenting, with whom Nolan and Lynch, JJ., join). The defendant organizations and individuals and "their officers, agents, servants, employees and those persons in active concert or participation with them who receive actual notice of this Order, either orally or by receipt of a copy thereof, are permanently enjoined, individually and collectively, from:

> "a. trespassing on, blocking or in any way obstructing access (either ingress or egress) to any facility in the Commonwealth which provides abortion counselling or services; or

> "b. physically restraining or obstructing or committing any acts of force or violence against persons entering, leaving, working at or seeking to obtain services from any facility in the Commonwealth which provides abortion counselling or services; or

> "c. directing, instructing, conspiring with and/or aiding or abetting directly or indirectly any person, persons, groups or organizations who engage in any of the acts described in paragraphs (a) and (b) above."

In my view, clauses (a) and (c) are constitutionally overbroad and should be vacated. In my dissent in *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701 (1990) (*Planned Parenthood I*), I presented my argument that clause (a) of the preliminary injunction at issue in that case was overbroad. My view has not changed. Therefore, because clause (a) of the permanent injunction at issue in this case is substantially the same as clause (a) of the preliminary injunction at issue in *Planned Parenthood I*, I dissent in the present case.

No worthwhile purpose would be served by a full repetition here of the views expressed in the earlier dissent. Essen-

tially, my position was and is that an injunction against the defendants and others "in active concert or participation with them" from "trespassing on, blocking, or in *any way obstructing* access" (emphasis added) to abortion facilities, is overbroad because "reasonable persons, wishing to express their views about the morality of abortion and whether abortion should be legal, [cannot] be confident that they would not violate that injunction by joining others on public ways adjacent to a clinic to picket, pray, chant, and exhort others to accept their viewpoint. The injunction expressly forbids not only trespassing and blocking, but also 'obstructing' ingress or egress in any way. It cannot reasonably be said that the prohibition against obstruction [in any way] adds nothing to the prohibition against trespassing and blocking[, both of which terms connote physical interference]. Such a result can be reached only by reading words out of the injunction. The injunction must fairly be construed as prohibiting the hindrance of access to clinics by nonphysical confrontation on public ways as well as the physical block[ing] of entranceways." *Planned Parenthood I, supra* at 721-722 (O'Connor, J., dissenting). Therefore, clause (a) and clause (c), which incorporates clause (a), impermissibly chill, even if they are not intended to prohibit, conduct protected by the First Amendment to the United States Constitution.