**Christina LLOYD, Plaintiff**

v.

**Greg BURT and Town of Southwick, Massachusetts, Defendants.**

**Civil Action No. 13–30011–KPN.**

United States District Court, D. Massachusetts.

Feb. 7, 2014.

---

Hope C. Button, Denner Pellegrino LLP, Springfield, MA, for Plaintiff.

Andrew J. Gambaccini, Reardon, Joyce & Akerson, P.C., Worcester, MA, David S.

Lawless, Nancy Frankel Pelletier, Robinson Donovan, PC, Springfield, MA, for Defendants.

### MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS

*(Document No. 18)*

NEIMAN, United States Magistrate Judge.

Presently before the court is a motion by Greg Burt ("Burt") and the Town of Southwick, Massachusetts ("Southwick") (together "Defendants"), seeking dismissal of the seven statutory and tort claims brought by Christina Lloyd ("Plaintiff"). Plaintiff alleges a violation of MASS. GEN. LAW ANN. ch. 12, § 11I (Count 1), as well as claims of assault and battery (Count II), negligence (Count III), malicious prosecution (Count IV), intentional infliction of emotional distress (Count V), and negligent infliction of emotional distress (Count VI), against Burt. Plaintiff also advances a sole count of negligence against Southwick (Count VII).

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); FED.R.CIV.P. 73. For the following reasons, Defendants' motion will be allowed in part and denied in part.

### I. BACKGROUND

Accepting as true Plaintiff's allegations, the facts are as follows. On May 18, 2010, Plaintiff, who resides in Connecticut, was babysitting her then two-year-old nephew at the child's residence in Massachusetts; the child's mother had been killed recently in an automobile accident and the child's father was not at home, as he was making funeral arrangements. (Amended Complaint (Document No. 17) at ¶ 6.) That evening, members of the Southwick Police Department, including Burt, arrived at the residence, purportedly to assist the Department of Children and Families ("DCF") in removing the child. (*Id.* at ¶ 7.) Neither DCF nor the Southwick Police Department had a warrant or any court authorization to remove the child. (*Id.*)

The officers told Plaintiff that the child needed to be handed over to DCF workers, and Plaintiff refused. (*Id.* at ¶ 8.) She was shoved onto a nearby couch and handcuffed. (*Id.*) Burt then "yanked" Plaintiff to her feet and led her from the residence. (*Id.*) He "proceeded to jerk [Plaintiff] back and forth by her handcuffed wrists, causing her injuries to her left and right shoulders and back." (*Id.*) When Plaintiff "attempted to defend herself," Burt "shoved her to the ground smashing her head on a rock in the driveway." (*Id.*) Burt "then yanked her up, placed her in the back seat of his cruiser and transported her to the Southwick Police Department." (*Id.*) She was later transported by ambulance from the Southwick Police Department to a hospital. (*Id.* ¶ 9.) Plaintiff alleges that Burt caused criminal proceedings of two counts of assault and battery on a police officer, pursuant to MASS. GEN. LAWS ANN. ch. 265, § 13D, to be brought against her. (*Id.* ¶ 31.) Plaintiff further avers that she suffered damages as a result of Burt's actions, including physical injury, emotional distress, and various other related expenses. (*Id.* ¶ 10.)

Plaintiff filed suit in state court on December 6, 2012, whereupon Defendants removed the case to this court pursuant to 28 U.S.C. § 1441. Defendants then filed a motion to dismiss which Plaintiff opposed, requesting at the same time permission for leave to amend her complaint. Given that request, which the court granted, the court denied Defendants' motion to dismiss without prejudice, Plaintiff then filed her amended complaint, followed by the instant motion to dismiss.

## II. Standard of Review

■ Generally, a complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To meet this standard, a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. Discussion

### A. Count I: Mass. Gen. Laws Ann. ch. 12, §§ 11H and 11I (against Burt)

Defendants seek dismissal of Count I, which alleges that Burt violated the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws Ann. ch. 12, §§ 11H and 11I, on grounds that Plaintiff fails to allege that actions taken by Burt were intended to threaten, intimidate, or coerce Plaintiff as required by the statute. · Defendants also argue that, to the extent that the allegation rests on a direct violation of Plaintiff's rights, it should be dismissed and that, in any event, the doctrine of qualified immunity insulates Burt from liability.

### 1. Threats, Intimidation, or Coercion

■ The MCRA provides a state remedy for the interference "by threats, intimidation or coercion, or attempt[s] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." Mass. Gen. Laws Ann. ch. 12, § 11H. Sec-

tion 11I of the statute authorizes private actions to vindicate these rights. "The remedy provided in §§ 11H and 11I is coextensive with the remedy provided under Federal law by means of 42 U.S.C. § 1983 (1982), except that the State statute does not condition the availability of the remedy on State action." *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 502 N.E.2d 1375, 1378 (1987). "Like all civil rights statutes, §§ 11H and 11I are entitled to liberal construction," *id.*, but the legislature did not intend to create " 'a vast constitutional tort,' " and thus "explicitly limited this remedy to situations where the derogation of secured rights occurs by 'threats, intimidation or coercion.' " *Bell v. Mazza*, 394 Mass. 176, 474 N.E.2d 1111, 1115 (1985) (quoting Mass. Gen. Laws Ann. ch. 12, § 11H).

■ To establish a claim under the MCRA, Plaintiff "must prove that (1) [her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Sietins v. Joseph*, 238 F.Supp.2d 366, 376 (D.Mass.2003) (quotation omitted). In other words, "[t]he MCRA contemplates a two-part sequence: liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has the constitutional right to do." *Spencer v. Roche*, 755 F.Supp.2d 250, 267 (D.Mass.2010).

Here, Defendants do not challenge Plaintiff's assertion that she has a Fourth Amendment right to be free from unreasonable seizure, nor do they suggest a lack of interference with that right. Rather, Defendants contest Plaintiff's claim on the ground that she failed to show an interfer-

ence with that right through threats, intimidation, or coercion, the first prong of the MCRA's two-part-liability sequence.

■ "Massachusetts courts apply an objective 'reasonable person' standard to determine whether conduct constituted threats, intimidation, or coercion." *Id.* at 265. " 'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct." *Planned Parenthood League of Mass., Inc. v. Blake,* 417 Mass. 467, 631 N.E.2d 985, 990 (1994) (citations omitted). Coercion is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.* (quotation omitted); *see also Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 473 N.E.2d 1128, 1131 (1985) (plaintiff presented facts showing "sufficient intimidation or coercion to satisfy the statute" when uniformed security officer ordered him to stop soliciting and distributing political handbills). While threats and intimidation under the MCRA "usually require actual or threatened physical force," coercion "is a broader category that may rely on physical, moral, or economic coercion." *Spencer,* 755 F.Supp.2d at 265.

■ In view of these standards, Plaintiff's complaint contains sufficient facts, and inferences to be drawn therefrom, such that a reasonable person could conclude that Burt subjected her to an unreasonable seizure in order to intimidate or coerce her into relinquishing her nephew to state officials in violation of MASS. GEN. LAWS ANN. ch. 12, § 11H. She alleges that when she refused to relinquish her nephew to DCF, Burt "yanked [her] to her feet and led her from the home" jerking her "back and forth by her handcuffed wrists," that when she resisted he "shoved her to the ground smashing her head on a rock in the driveway," and that he "then yanked her up, placed her in the back seat of his cruiser and transported her to the Southwick Police Department." The reasonable inference that can be drawn from these facts is that Burt put Plaintiff in fear—of physical harm or of being arrested—for the purpose of compelling conduct or that he constrained her against her will to do something she otherwise would not have done, *i.e.,* that she allow DCF to take custody of her nephew. The constitutional dimensions of this subject are addressed in subparagraph 3 below.

*2. Direct Violation of Plaintiff's Rights*

Relatedly, Defendants argue that a direct violation of a person's right does not constitute a *per se* violation of the MCRA, relying primarily on *Longval v. Commissioner of Correction,* 404 Mass. 325, 535 N.E.2d 588, 593 (1989). In *Longval,* the Supreme Judicial Court ruled that shackling and handcuffing a prisoner and taking him to a different facility was "not by itself coercive under the Civil Rights Act," explaining that "[n]ot every violation of law is a violation of the State Civil Rights Act. A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act." *Id.* The SJC found "no coercion" under the MCRA, "simply from the use of force by prison officials, authorized to use force, in order to compel a prisoner to do something he would not willingly do, even if it turns out that the official had no lawful right to compel the prisoner to take that action." *Id.* The court further explained that "[i]f the officials had some further purpose in treating [the plaintiff] as they did, threats, intimidation, or coercion might be involved. Conduct, even unlawful conduct, however, lacks these qualities when all it does is take someone's rights away directly." *Id.; see also Pheasant Ridge Assocs. Ltd. P'ship v. Burlington,*

399 Mass. 771, 506 N.E.2d 1152, 1158–59 (1987) (explaining that a taking done in bad faith "was an attempted direct, preemptive act and did not seek to coerce any plaintiff to do or not to do anything" and that even unlawful legislation is not coercive when it "seeks to eliminate the rights of a person and does not seek to force that person unwillingly to do or not to do something otherwise lawful").

Unlike the situation in *Longval*, Plaintiff alleges that Burt violated her rights when he subjected her to an unreasonable seizure *in order to accomplish another purpose*, namely, to force her to hand over her nephew to DCF. On these facts, Plaintiff plausibly states that Burt had a "further purpose" in treating Plaintiff as he did. *Longval*, 535 N.E.2d at 593.

### 3. Qualified Immunity

 Finally, Defendants contend that Count I must be dismissed because Burt is immune from the claim under the doctrine of qualified immunity. In fact, when enacting the MCRA, the legislature "intended to adopt the standard of immunity for public officials developed under 42 U.S.C. § 1983." *Rodriques v. Furtado*, 410 Mass. 878, 575 N.E.2d 1124, 1127 (1991). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* This protection "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quotation omitted). The United States Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* (quotation omitted); *see also Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir.2009) (same). Under the two-part test for qualified immunity "[a] court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado*, 568 F.3d at 269 (quoting *Pearson*, 555 U.S. at 231, 129 S.Ct. 808).

Defendants assert Plaintiff's claim fails under the first prong of this analysis, namely, that the facts alleged by Plaintiff do not make out a violation of a constitutional right. Citing *Hatch v. Department for Children*, 274 F.3d 12, 20 (1st Cir. 2001), Defendants argue that, while parents possess a liberty interest in the "care, custody, and control of their children," there is no corresponding liberty interest held by baby sitters or non-custodial aunts. Defendants claim as well that they are unaware of any provision of the Massachusetts Declaration of Rights or statutory law which confers such a right.

For her part, Plaintiff argues that, under *Hatch*, parents have an inviolate right to the care, custody and control of their children absent a reasonable suspicion of child abuse or imminent threat of abuse. In turn, Plaintiff asserts, that constitutional right vested in her when she was granted care and custody of her nephew from his father; Burt thus violated this right when, with DCF, he demanded her nephew and then physically assaulted her. In addition, Plaintiff asserts that neither Burt nor DCF had any authority, or even a

reasonable suspicion of abuse, to warrant removing the child.

 Two related concepts inform the decision as to whether Plaintiff has identified a protected right, first, the notion of family privacy. Ingrained in society, and older than the bill of rights, are the freedoms to marry and to have children. *Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 845, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). "Accordingly, unlike property interests that are also protected by the Fourteenth Amendment, the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in this Nation's history and tradition." *Id.* (quotation marks and citations omitted). In this vein, *Hatch* recognized that "[t]he interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution" and protected by the Due Process Clause. 274 F.3d at 20. However, "the law recognizes that the protection afforded to the parents' interest must be balanced against other valid interests, particularly the best interests of the child and the interest of society in the maturation of children as future citizens." *Id.* The state's interest enables it to investigate allegations of child abuse, to terminate the parent-child relationship if clear and convincing evidence of parental unfitness results from that investigation, and in the interim, separate child from parent prior to a hearing for cause shown. *Id.* With regard to the interim-removal measure, "the Constitution allows a case worker to take temporary custody of a child, without a hearing, when the case worker has a reasonable suspicion that child abuse has occurred (or, alternatively, that a threat of abuse is imminent)" and, therefore, parental rights to the care, custody and control

of a child "is inviolate unless a case worker has such a suspicion." *Id.* at 22.

Second is the custom of babysitting, "a longstanding social custom that serves functions recognized as valuable by society" and "a sufficiently common phenomenon to permit certain basic generalizations." *People v. Moreno*, 2 Cal.App.4th 577, 583, 584, 3 Cal.Rptr.2d 66 (1992) (quoting *Minnesota v. Olson*, 495 U.S. 91, 99, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)). "A baby-sitter is someone engaged to care for one or more children when the parents are not at home"; the person is "responsible for addressing the child's needs in their infinite variety, from mundane matters to emergencies." *Id.* at 584, 3 Cal. Rptr.2d 66 (quotation omitted). "Babysitting has numerous aspects—the consideration for the sitter's services, if any, the place where the services are provided, and the duration of the engagement are but a few." *Id.* Whatever the specifics of a particular babysitting engagement, however, the baby sitter, as a general practice, "is in exclusive charge of the child and the premises" which distinguishes a baby sitter from other household visitors, such as an overnight guest. *Id.* The typical purpose behind obtaining a baby sitter is to free "the parent from the child and the house," and, therefore, "[b]y definition the baby-sitter and the parent or guardian will not be present in the same house at the same time, other than at the time of the 'changing of the guard.'" *Id.*

Given this arrangement, parents delegate certain of their responsibilities and rights to babysitters. While a child's parents retain ultimate authority and parental rights, a baby sitter, in the court's view, has derivative responsibility for the child. *See* R. Cahn, Reframing Child Custody Decisionmaking, 58 Ohio St. L.J. 1, 51 n. 198 (1997). Furthermore, "[a] babysitter has an obligation to protect her charge

from harm. Of necessity, this obligation entitle[s] her to exclude others from the premises." *State v. Anonymous*, 40 Conn. Supp. 20, 480 A.2d 600, 609 (1984).

Considering these two concepts in tandem, the court concludes that Plaintiff has articulated a protected interest in the care, custody and control of her nephew as his caretaker. Although Plaintiff derives her rights from the child's surviving parent, it can hardly be said that she had no interest in preventing a seizure, appearing legally baseless to her, of the child in her care. In short, the court finds, Plaintiff has standing to challenge the seizure of a child entrusted to her care just as a baby sitter has standing to challenge the search of a home. *Cf. Moreno*, 2 Cal.App.4th at 584, 587–88, 3 Cal.Rptr.2d 66 (concluding a baby sitter has standing to challenge search and seizure and explaining that "the baby-sitter who comes to the child's home will likely have, unlike the overnight guest, the exclusive right to 'determine who may or may not enter the household.'" (quoting *Olson*, 495 U.S. at 99, 110 S.Ct. 1684)); *Anonymous*, 480 A.2d at 609 ("As the caretaker of the child, [the baby sitter] undoubtedly had a socially acceptable expectation of privacy."); *State v. Elrod*, 395 S.W.3d 869, 878 (Tex.Ct.App.2013) (acknowledging, in the context of search and seizure, that defendant-babysitter "had dominion and control over the residence and had the right, perhaps even the duty, to exclude others from the home"). Accordingly, Plaintiff's claim survives the first prong of the qualified immunity analysis.

■ That said, the court must also consider whether the contours of the identified right, here Plaintiff's right to the care, custody and control of her nephew, were "'clearly established' at the time of the defendant's alleged violation." *Maldonado*, 568 F.3d at 269 (quoting *Pearson*, 555 U.S. at 231, 129 S.Ct. 808). "Cognizant of both the contours of the allegedly infringed right and the particular facts of the case, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 269 (quotation omitted). In other words, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.* In assessing "whether the dimensions of the right were sufficiently well-defined that a reasonable official would have understood that his actions violated that right" it is not necessary that "a court must already have outlawed similar conduct; the test is satisfied if, viewed in the light of preexisting jurisprudence, the unlawfulness of the conduct is apparent." *Hatch*, 274 F.3d at 22.

The court concludes, for purposes of the present motion to dismiss, that the state of the law in May 2010 gave Burt fair warning that his conduct was likely unconstitutional. The First Circuit itself had concluded as early as 2000 that "an objectively reasonable case worker surely would have believed that taking temporary custody of a child prior to a hearing would violate the parents' interest in the child's care, custody, and control if he acted without a reasonable suspicion of child abuse (actual or imminent)." *Id.* at 24. Thus, an investigator who took a child into custody without a hearing had fair warning that he risked violating a father's constitutional rights if he did so without a reasonable basis for his suspicions of child abuse. *Id.* In this court's view, any distinction between a parent and a caretaker, as Defendants suggest, is immaterial given the facts alleged here.

Plaintiff has plausibly established for present purposes that she was charged

with her nephew's care while the boy's father was away from the home making funeral arrangements for the child's mother, and that it was during this time that Plaintiff "refused" Burt's efforts, assisting DCF, to remove the child. Accepting as true Plaintiff's assertion in her complaint that DCF did not have legal authorization to remove the child, the court finds that a reasonable officer would be on notice that it was unlawful to take the child—from a parent or a caretaker—without legal authority. Moreover, there is nothing to suggest that either Burt or DCF had a suspicion of child abuse.

Defendants, however, do argue that Burt's role in assisting DCF was authorized by Massachusetts law and constitutionally permissible. But Defendants make no assertion that DCF was in fact conducting an investigation or otherwise authorized to remove the child. *See* MASS. GEN. LAWS ANN. ch. 119, § 51B (outlining DCF procedure upon receipt of report of child abuse), 110 CMR § 4.26(2), (3) (describing investigation of emergency reports of child abuse); 110 CMR § 4.29 (emergency removal). Thus, although Defendants may have answered the question of whether Burt was permitted, generally speaking, to assist DCF, they have not addressed whether there was an investigation here and, if so, what facts supported it. In sum, the facts here are insufficient for the court to determine, at this stage, that the defense of qualified immunity applies to Burt's actions here. *See Hatch,* 274 F.3d at 24. (analyzing, for purposes of qualified immunity, whether an investigator possessed reliable information to support a reasonable suspicion of abuse).

### B. Count II: Assault and Battery (against Burt)

■ Defendants also seek to dismiss the assault and battery claim against Burt. Assault and battery claims against police officers that use excessive force

when executing an arrest are in fact permitted. *Raiche v. Pietroski,* 623 F.3d 30, 40 (1st Cir.2010). "Assault and battery is the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *Spencer,* 755 F.Supp.2d at 268 (quotation omitted). A valid defense to a claim of assault and battery is that the police officer used "reasonable force" in conducting the arrest. *Raiche,* 623 F.3d at 40. Therefore, the relevant question in this context is "whether the use of force was objectively reasonable in [F]ourth [A]mendment terms." *Spencer,* 755 F.Supp.2d at 268 (quotation omitted). To satisfy this standard here, Plaintiff "must demonstrate that [Burt's] actions were not objectively reasonable, viewed in light of the facts and circumstances confronting [him] and without regard to [his] underlying intent and motivation." *Id.* (quotation omitted).

■ In seeking dismissal, Defendants argue that Plaintiff had no right to physically block DCF from taking her nephew into custody or to interfere with officers assisting DCF and that doing so actually created a dangerous situation such that shoving her away and placing her in handcuffs was reasonable. Defendants also assert that Plaintiff's allegation that she "attempted to defend herself" against Burt cannot support a claim for assault and battery and, in addition, that actively resisting her arrest rendered Burt's action of shoving her to the ground reasonable. For her part, Plaintiff asserts that the allegations in her complaint are sufficient to state a claim for assault and battery and that, while Burt may have raised a possible defense, a factual issue remains as to whether his use of force was excessive under the circumstances. In essence, Plaintiff asserts, the court simply does not

have enough information at this stage of the litigation to test Burt's defense.

Plaintiff has the better argument. Plaintiff's factual allegations in her complaint plausibly entitle her to relief: she alleges that Burt "shoved [her] onto a nearby couch" when she refused to relinquish her nephew to DCF, that he "yanked" her to her feet and "proceeded to jerk [her] back and forth by her handcuffed wrists, causing her injuries." Contrary to Defendants' argument, the complaint does not state that Plaintiff physically precluded DCF from taking custody of the child. Furthermore, as noted, the court has yet to be provided factual support that either DCF or Burt had the legal authority to seize Plaintiff's nephew. Without further information as to what Plaintiff's "refus[al]" entailed, the court cannot now say that Burt's actions were reasonable as a matter of law.

Finally, Defendants' argument that Plaintiff's "attempt[ ] to defend herself" cannot give rise to a claim of assault and battery fares no better. Whatever effect this allegation may have on a subsequent determination as to whether Burt used reasonable force when he "shoved" Plaintiff to the ground and "smash[ed] her head on a rock in the driveway," this isolated statement does not form the basis of Plaintiff's assault and battery claim; as described Plaintiff has alleged sufficient facts to support a claim of tortious physical conduct prior to Plaintiff's attempted "defense." For all these reasons, the court will deny Defendants' motion to dismiss the assault and battery count.

### C. Count III: Negligence Burt (against Burt)

Defendants also seek dismissal of the negligence claim against Burt, arguing that MASS. GEN. LAWS ANN. ch. 258, § 2 precludes state law claims for negligence against a municipal employee. Section 2, in relevant part, provides as follows:

Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment.... The remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer or, the public employee or his estate whose negligent or wrongful act or omission gave rise to such claim, and no such public employee or the estate of such public employee shall be liable for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment; provided, however, that a public employee shall provide reasonable cooperation to the public employer in the defense of any action brought under this chapter.

MASS. GEN. LAWS ANN. ch. 258, § 2. Defendants assert that Plaintiff's negligence claim against Burt fails under this provision because it is beyond dispute that such a claim must be brought against the municipality itself. In essence, Plaintiff appears to argue, not entirely clearly, that the statute bars her claim only if Burt cooperated with Southwick and that, in any event, the town may be liable for the negligence claim alleged against him.

Defendants have the better argument. As was true in *Gross v. Bohn,* 782 F.Supp. 173, 182 (D.Mass.1991), dismissal of the claim is appropriate since Plaintiff has failed to alleged that Burt "was acting in any capacity other than his capacity as a municipal police officer during all time periods relevant to this action." As for Plaintiff's other arguments, she makes no allegation that Burt has failed to cooperate in the defense of this action and provides no further explanation as to the legal basis by which Southwick, against whom no such

claim has been made, may be liable for Burt's possible negligence under the statute.

### D. Count IV: Malicious Prosecution (against Burt)

■ Defendants next contend that dismissal of Plaintiff's malicious prosecution claim is warranted because it relies entirely on conclusory allegations contained in the complaint. The court agrees. A claim for malicious prosecution consists of four elements: "1) that the defendant initiated a criminal action against [the plaintiff]; 2) that the criminal prosecution ended in [the plaintiff's] favor; 3) that there was no probable cause to initiate the criminal charge; and 4) that the defendant acted maliciously." *Miller v. City of Boston*, 297 F.Supp.2d 361, 366 (D.Mass.2003) (quotation omitted); *see also Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 858 N.E.2d 746, 753 (2006).

■ Here, Plaintiff's allegations simply echo these elements. In particular, Plaintiff's allegation that Burt "caused" criminal proceedings of two counts of assault and battery on a police office under MASS. GEN. LAWS ANN. ch. 265, § 13D to be brought against her is conclusory at best and insufficient to "allow[ ] the court to draw the reasonable inference that [Burt] is liable for the [malicious prosecution] alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. To the extent that Plaintiff's malicious prosecution claim is based upon her warrantless arrest, a claim for false arrest, not malicious prosecution, is the proper vehicle to seek a remedy. *See Meehan v. Town of Plymouth*, 167 F.3d 85, 90 (1st Cir.1999). Accordingly, Plaintiff's claim for malicious prosecution will be dismissed.

### E. Count V: Intentional Infliction of Emotional Distress (against Burt)

As for Plaintiff's claim for intentional infliction of emotional distress against Burt, Defendants assert that his conduct was not extreme and outrageous and the claim should be dismissed. For the reasons which follow, the court is not persuaded.

To prevail on a claim of intentional infliction of emotional distress, Plaintiff must show (1) that Burt "intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct," (2) that Burt's "conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community,'" (3) that his actions caused Plaintiff's distress, and (4) "that the emotional distress sustained by [Plaintiff] was 'severe' and of a nature 'that no reasonable [woman] could be expected to endure it.'" *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 318–19 (1976) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmts. i, d, j (1965)). The "extreme and outrageous" element of this claim

cannot be predicated upon "mere insults, indignities, threats, annoyances, pretty oppressions, or other trivialities," nor even is it enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitled the plaintiff to punitive damages for another tort"; rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72, 81 (1987) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt.d (1965)). In

essence, Defendants argue that Plaintiff's claim is deficient because she has failed to allege facts that Burt acted in an extreme and outrageous manner.

The court concludes that the question of whether Burt's actions—physically . shoving, yanking and jerking Plaintiff—were extreme and outrageous should be determined by a jury. A similar situation arose in *Eason v. Alexis,* 824 F.Supp.2d 236, 243 (D.Mass.2011), where the court denied the defendant police officers' motion for summary judgment on just such a claim. The court explained that, although an allegation of false arrest, by itself, does not give rise to a claim for intentional infliction of emotional distress, the plaintiff presented far more evidence, namely, that the defendant officers tackled him without provocation, threw him over a porch railing causing a severe break in his ankle, pointed a loaded gun at him, and then filed a criminal complaint to cover up the incident. *Id.*

Here, too, Plaintiff alleges far more than a simple claim of negligence. As described, Plaintiff alleges that she endured unwarranted physical abuse by Burt while her nephew was in her care after his mother was recently killed in a car accident and his father was making funeral arrangements. The specifics of Burt's actions, as alleged by Plaintiff, have been described above. Accepting these allegations as true for present purposes, the court will not dismiss Plaintiff's claim.

### F. Count VI: Negligent Infliction of Emotional Distress (against Burt)

For the reasons stated *supra,* Part IIIC, MASS. GEN. LAWS ANN. ch. 258, § 2 precludes Plaintiff from advancing a negligent infliction of emotional distress claim against Burt directly. *See Wilmot v. Tracey,* 938 F.Supp.2d 116, 144 (D.Mass.2013)

(holding that, as a matter of law, MASS. GEN. LAWS ANN. ch. 258, § 2 barred the plaintiff's negligent infliction of emotional distress claim). Accordingly, this claim will be dismissed.

### G. Count VII: Negligence Claim (against Southwick)

▮ Finally, Defendants assert that dismissal is appropriate for Plaintiff's sole claim against Southwick for negligence, which claim targets Southwick's alleged failure to train and supervise Burt. "To establish a claim for negligence under Massachusetts law, a tort plaintiff must show that the defendant owed him a duty, the defendant breached that duty, the breach constituted a proximate cause of the ensuing harm, and the breach caused actual injury." *Rochleau v. Town of Millbury,* 115 F.Supp.2d 173, 178 (D.Mass. 2000).[1]

▮ Defendants contend that dismissal of this claim is called for because Plaintiff has proffered few if any factual allegations in support. The court agrees. As Defendants argue, Plaintiff's allegations are merely labels and conclusions and, therefore, insufficient to state a claim upon which relief can be granted. Plaintiff merely alleges that Southwick owed a duty to the public to properly select, train, supervise and discipline police officers, that Southwick breached this duty by failing to properly select, train, supervise and discipline police officers, and that Plaintiff suffered injuries as a direct and proximate result of this breach. But the complaint contains no factual content which would allow the court to reasonably infer that Southwick is liable for such negligence. *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Indeed, the complaint makes no mention

---

**1.** Plaintiff's complaint does not allege—and Plaintiff does not argue in her opposition to the motion to dismiss that it does—that this

negligence claim against Southwick is based upon its liability for the negligent acts of Burt. See discussion above at IIIC.

whatsoever of Southwick's training or supervision of police officers. *Cf. Parks v. Town of Leicester*, 2011 WL 864823, at \*7 (D.Mass. Mar. 9, 2011) (holding the plaintiff failed to provide fair notice of a claim for negligent training and supervision against a town for conduct of a police officer because the complaint contained no mention of the town's negligence with regard to the training and supervision). Accordingly, this claim will be dismissed.

### IV. CONCLUSION

For the reasons stated, Defendants' motion to dismiss is ALLOWED in part and DENIED in part as described above. As a result, the following claims survive, all of which concern Burt: Count I (the MCRA violation), Count II (assault and battery), and Count V (intentional infliction of emotional distress).

IT IS SO ORDERED.